IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

**HUNTINGTON DIVISION**

MICHAEL CANTLEY, individually, and on behalf of
a Class of others similarly situated,

Plaintiff,

v.                                          CIVIL  ACTION  NO.  3:09-0758

THE WEST VIRGINIA REGIONAL JAIL and
CORRECTIONAL FACILITY AUTHORITY; and
TERRY L. MILLER, both individually and in his
official capacity as Executive Director of the
West Virginia Regional Jail and Correctional
Facility Authority,

Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is a Motion to Dismiss by Defendants The West Virginia

Regional Jail and Correctional Facility Authority (WVRJA) and Terry L. Miller. [Doc. No. 16].

Upon consideration of the arguments by the parties, the Court **DENIES** Defendants' motion.

**I.**
**FACTS**

On October 9, 2009, Plaintiff Michael Cantley, individually and on behalf of a Class

of others similarly situated, filed his First Amended Complaint.  In his First Amended Class Action

Complaint, Plaintiff asserts he was arrested on or about September 28, 2008, on non-felony charges

of violating a domestic violence protection order.  Plaintiff states he was at his former wife's house

in violation of the order, but he did not harm her or anyone else while there.  Following his arrest,

Plaintiff was taken into custody and placed in a holding cell at the Western Regional Jail, where

Plaintiff states he has been in custody on several previous occasions.  According to Plaintiff,

Defendant WVRJA is responsible for the policies, practices, supervision, implementation, and conduct of all matters pertaining to the West Virginia Regional Jail System, which includes the Western Regional Jail.  Defendant Miller is the duly appointed Executive Director and a policy maker for the WVRJA.

After several hours of custody, Plaintiff was required to undergo a visual cavity strip search (vcs)[1] and delousing pursuant to a WVRJA policy.  Although Plaintiff claims his arrest was void of any reasonable suspicion he possessed any weapons or contraband, the policy required him to completely disrobe in front of a correctional officer of the same sex for a visual inspection. During the inspection, Plaintiff had to lift his arms and legs, spread his butt cheeks, lift up his testicles and bend at the waist.  The correctional officer then sprayed a delousing solution on him and required him to shower in view of the officer.  Plaintiff claims that correctional officers receive no medical training in applying the delousing solution and the delousing policy is enforced without

---

[1]"A 'strip search,' though an umbrella term, generally refers to an inspection of a naked individual, without any scrutiny of the subject's body cavities.  A 'visual body cavity search' extends to visual inspection of the anal and genital areas.  A 'manual body cavity search' includes some degree of touching or probing of body cavities." *Blackburn v. Snow*, 771 F.2d 556, 561 n. 3 (1st Cir. 1985) (citation omitted).  Although Plaintiff states he was not subjected to a physical cavity search, he makes a cursory statement that he believes some members of the proposed class may have been subject to such a search.  Defendants deny they do physical cavity searches.  In any event, Plaintiff does not focus on this type of search in his briefing before the Court, and it does not appear that he relies upon this type of search in any of his causes of action.  In the First Amended Complaint, Plaintiff states he refers collectively to strip and vcs searches as "strip searches," and these require a detainee to manipulate body parts for a visual inspection of the detainee's genitals and anus.  A physical cavity search is not included in this description.  He then proceeds to discuss only strip and vcs searches in his causes of action, with no specific mention of physical cavity searches.  Thus, this Court will not discuss the impact physical cavity searches may have on the constitutional issues raised in this case.

any medical evaluation to determine if lice are present.  Based upon information and belief, Plaintiff

further asserts that the WVJRA uses "Liceall," which Plaintiff alleges is a caustic solution that can,

and often does, cause chemical burns, especially when applied to African-Americans.  Following

his shower, Plaintiff was issued prison clothing to wear.  Plaintiff remained incarcerated until on or

about November 6, 2008, when all charges against him were dismissed.


Plaintiff argues the strip search and delousing policy as applied to pretrial detainees

charged with misdemeanors or other minor crimes is unconstitutional under the Fourth and

Fourteenth Amendments and 42 U.S.C. § 1983.  As a result of the policy, Plaintiff claims to have

suffered psychological pain, humiliation, suffering, and mental anguish.  Plaintiff brings this action

on behalf of himself and others similarly situated seeking declaratory and injunctive relief,

compensatory damages, and attorneys' fees and costs.  On the other hand, Defendants contend that

the strip search policy and the delousing procedures are necessary for safety and health reasons.

Thus, Defendants argue the policies do not violate the Fourth Amendment.

## II.
## STANDARD OF REVIEW

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the United States Supreme

Court disavowed the "no set of facts" language found in *Conley v. Gibson*, 355 U.S. 41 (1957),

which was long used to evaluate complaints subject to 12(b)(6) motions. 550 U.S. at 563.  In its

place, courts must now look for "plausibility" in the complaint.  This standard requires a plaintiff

to set forth the "grounds" for an "entitle[ment] to relief" that is more than mere "labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 555.

(internal quotation marks and citations omitted).  Accepting the factual allegations in the complaint

as true (even when doubtful), the allegations "must be enough to raise a right to relief above the speculative level . . . ." *Id*. (citations omitted). If the allegations in the complaint, assuming their truth, do "not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Id*. at 558 (internal quotation marks and citations omitted).

In *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), the Supreme Court explained the requirements of Rule 8 and the "plausibility standard" in more detail. In *Iqbal*, the Supreme Court reiterated that Rule 8 does not demand "detailed factual allegations[.]" 129 S. Ct. at 1949 (internal quotation marks and citations omitted). However, a mere "unadorned, the-defendant-unlawfully-harmed-me accusation" is insufficient. *Id*. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. (quoting *Twombly*, 550 U.S. at 570). Facial plausibility exists when a claim contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citation omitted). The Supreme Court continued by explaining that, although factual allegations in a complaint must be accepted as true for purposes of a motion to dismiss, this tenet does not apply to legal conclusions. *Id*. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. (citation omitted). Whether a plausible claim is stated in a complaint requires a court to conduct a context-specific analysis, drawing upon the court's own judicial experience and common sense. *Id*. at 1950. If the court finds from its analysis that "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the

pleader is entitled to relief.'" *Id*. (quoting, in part, Fed. R. Civ. P. 8(a)(2)).  The Supreme Court further articulated that "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id*.

### III.
### DISCUSSION

### A.
### The Strip Search Policy

The issue facing the Court in this case is whether the alleged blanket strip search and delousing policy is constitutional.  The parties agree that this issue is controlled by the United States Supreme Court's benchmark decision in *Bell v. Wolfish*, 441 U.S. 520 (1979).  In *Bell*, the Court was asked to consider the constitutional rights of pretrial detainees who were subject to a variety of correctional conditions and practices at the Metropolitan Correctional Center (MCC). 441 U.S. at 523.[2]  The Court began by recognizing that, under the Due Process Clause, a condition of confinement for a pretrial detainee cannot amount to a punishment. *Id*. at 535-36 n.16.  However, the Court was careful to state that not every restriction placed upon a pretrial detainee is a punishment under the Constitution.  Clearly, the government must have the power to effectuate detention when necessary.  "Loss of freedom of choice and privacy are inherent incidents of confinement in such a facility." *Id*. at 537.  The fact that confinement interferes with a detainee's

---

[2]MCC was a federally-run short-term facility that primarily housed pretrial detainees. *Id*. There were, however, some convicted inmates at the facility. *Id*. at 524.

comfort and restraint levels "does not convert the conditions or restrictions of detention into 'punishment.'" *Id*.

In determining when the constitutional line is crossed, "[a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id*. at 538 (citation omitted).  If there is no expressed punitive intent, the decision generally will rest on "'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purposes assigned [to it].'" *Id*. (citations omitted).  If a condition or restriction is reasonably related to a legitimate governmental goal, "it does not, without more, amount to 'punishment.'" *Id*. at 539 (footnote omitted).  On the other hand, if a condition is arbitrary or purposeless or otherwise not reasonably related to a governmental objective, a court "may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Id*. (citation and footnote omitted).

When deciding whether a particular policy is constitutional, courts also must be mindful of the government's interest in maintaining security and order at the facility and in making sure that "no weapons or illicit drugs reach detainees.  Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial " *Id*. at 540 (footnote omitted).  In other words, effective management of a facility "is a valid objective that may justify imposition of

-6-

conditions and restrictions of pretrial detention and dispel any inference that such restrictions are intended as punishment." *Id*. (footnote omitted).

The Court also identified several general principles guiding the constitutionality of restrictions. First, the Court said "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Id*. at 545 (citations omitted). Second, although inmates maintain some constitutional rights, it "does not mean that these rights are not subject to restrictions and limitations." *Id.* Third, institutional security, order, and discipline are all "essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Id*. at 546. In this regard, the Court said in a footnote that "[t]here is no basis for concluding that pretrial detainees pose any lesser security risk than convicted inmates." *Id.* at 547 n. 28. Lastly, it is important to recognize that there are not easy answers to operating a correctional facility on a day-to-day basis. "Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id*. (citations omitted). The Court cautioned that lower courts must be wary that such management decisions "are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Id*. 547-48 (citations omitted).

Relying upon this analysis, the Court proceeded to discuss some of the specific issues before it. As relevant here, one of those issues involved vcs searches of all inmates at Bureau of Prison facilities, including MCC, after every contact visit with an outsider. *Id.* at 558. Correctional officials testified such searches were necessary to prevent and deter the smuggling of weapons, drugs, and other contraband into the facilities. *Id.* Although the practice gave the Court pause, it nonetheless held that it did not violate the reasonableness requirement of the Fourth Amendment for either convicted prisoners or pretrial detainees. *Id.* Under the Fourth Amendment, reasonableness "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* at 559 (citations omitted). In acknowledging the security issues arising in a detention facility, the Court noted the prevalence of smuggling items into facilities and stated that "inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record and in other cases." *Id.* (citations omitted). The Court further said the fact that there was only one documented instance of an MCC inmate attempting to smuggle in contraband on his person may demonstrate the deterrent effect of the policy. *Id.* Balancing the security interests against privacy interests, the Court concluded that a vcs search under the MCC rules can "be conducted on less than probable cause." *Id.* at 560.

Two years after the *Bell* decision, the Fourth Circuit was confronted with the reasonableness of a visual strip search in *Logan v. Shealy*, 660 F.2d 1007 (4th Cir. 1981). The plaintiff Lucy Logan was involved in an auto accident and was suspected of driving while

intoxicated (DWI). 660 F.2d at 1009.  Ms. Logan was taken to the Arlington County Detention Center, but refused to take a breathalyzer test.  A magistrate judge issued warrants for DWI and refusal to take the test.  Ms. Logan was booked on the charges, and the magistrate judge ordered her released on her own recognizance. *Id.* at 1010.  However, to ensure Ms. Logan's sobriety, the magistrate judge directed that she could not leave the facility for four hours unless a responsible person picked her up. *Id.*

Prior to Ms. Logan being given the opportunity to call someone to pick her up, a female deputy sheriff inventoried her personal property, took her to a holding cell, and conducted a visual strip search pursuant to an established policy that all persons held at the Center be strip searched for weapons or contraband regardless of the offense.  The policy was adopted "after a deputy allegedly was shot by a misdemeanant who had not been strip-searched." *Id.*  Following the search, Ms. Logan was allowed to call a friend and was released upon her friend's arrival. *Id.* Thereafter, Ms. Logan filed suit alleging, in part, that the strip search policy was unreasonable in its scope and manner. *Id.* at 1011.  Upon consideration of the evidence, the Fourth Circuit agreed.

In so holding, the Fourth Circuit relied upon *Bell* and found that the "strip search bore no . . . discernible relationship to security needs at the Detention Center that, when balanced against the ultimate invasion of personal rights involved, it could reasonably be thought justified." *Id.* at 1013.  The Court noted that detainees, like Ms. Logan, were not intermingled with the general population, her offense was not one commonly associated with possession of weapons or contraband, there was no reason to believe she was harboring a weapon or contraband, and she was

at the facility an hour and a half before she was subject to the strip search and she had not even been patted down.  The Fourth Circuit held that "[a]n indiscriminate strip search policy routinely applied to detainees such as Logan along with all other detainees cannot be constitutionally justified simply on the basis of administrative ease in attending to security considerations." *Id.*  (citation omitted).

Since *Logan* was decided in 1981 numerous other district court's and the vast majority of courts of appeals have found strip searches of pretrial detainees, who are arrested for misdemeanor offenses, unconstitutional in an absence of some particularized suspicion that a specific individual may have contraband.  For instance, in *Mary Beth G. v. City of Chicago*, 723 F.2d 1263 (7th Cir. 1984), the Seventh Circuit cited both *Bell* and *Logan* in striking down a policy by the City of Chicago that required strip and vcs searches "of all women arrested and detained in the City lockups, regardless of the charges against the women and without regard to whether the arresting officers or detention aides had reason to believe that the women were concealing weapons or contraband on their persons." 723 F.2d at 1266.

The plaintiffs in *Mary Beth G.* were women arrested on misdemeanor offenses and were detained while awaiting bail money. *Id.*  The Seventh Circuit observed that the balancing test prescribed in . . . [*Bell*] does not validate strip searches in detention settings *per se*."  *Id.* at 1272 (citations omitted).  Although the Supreme Court upheld the strip search in *Bell*, the Seventh Circuit stated it did so on much different facts.  Thus, the Court found it necessary to apply the balancing test announced in *Bell* to the facts before it.

-10-

In doing so, the Seventh Circuit remarked that there are few instances that invade an individual's privacy more than a vcs search. The City argued, however, that such searches were necessary to prevent misdemeanor offenders from bringing weapons and contraband into the lockup facilities. Despite these arguments, the Seventh Circuit found that only a few items over the years were ever discovered during a body cavity search of women arrested for minor offenses. *Id.* Thus, the Seventh Circuit found using *Bell*'s balancing test that "the strip searches bore an insubstantial relationship to security needs" and cannot be considered reasonable under these facts. *Id.* at 1273 (citing *Logan*).[3]

More recently in *Allison v. The GEO Group, Inc.*, 611 F. Supp.2d 433 (E.D. Pa. 2009), the district court, as here, was confronted with a blanket strip search policy of all arrestees detained at one of the custodial facilities operated by the defendant. The searches allegedly were conducted irrespective of any reasonable suspicion or probable cause that the individual being searched had any contraband. *Id.* at 438. The district court recognized that detention situations obviously require the curtailment of rights, including personal privacy and Fourth Amendment rights. In addition, courts should limit their roles in the administration of detention facilities. *Id.* at 442 (citations omitted). The court then proceeded to discuss *Bell*'s reasonableness test and noted

---

[3]The policy also was challenged on equal protection grounds because it did not apply to men. *Id.* at 1266. The Seventh Circuit found, as an additional ground, that the policy violated the Fourteenth Amendment's equal protection clause. *Id.* at 1274.

-11-

that most courts addressing custodial strip searches have relied upon that test in evaluating claims.

*Id*. at 448.[4]

---

[4]The defendant in *Allison*, however, argued that *Bell* no longer controlled such decisions, but rather, the court should rely upon the holdings in *Hudson v. Palmer*, 468 U.S. 517 (1984), and *Turner v. Safley*, 482 U.S. 78 (1987).

In *Hudson*, the Supreme Court addressed the constitutionality under the Fourth Amendment of searching prisoners' cells. The Court held that "society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." 468 U.S. at 526. In *Turner*, inmates had challenged under the First and Fourteenth Amendment certain prison regulations related to inmate marriages and inmate-to-inmate correspondence. 482 U.S. at 81. In that case, the Court announced a four-part test to consider in determining the reasonableness of a prison restriction, which includes: (1) whether there is "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it[;]" (2) "whether there are alternative means of exercising the right that remain open to prison inmates[;]" (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally[;]" and (4) "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Id*. at 89-90 (citations omitted).

In rejecting both of these standards in *Allison*, the district court noted that neither *Hudson* nor *Turner* overruled *Bell*'s holding or analysis. 611 F. Supp.2d at 445 & 448. In fact, a decision rendered by the Supreme Court on the same day as *Hudson* affirmed *Bell*'s Fourth Amendment assumption with regard to searching the cells of pretrial detainees. *Id*. at 445 (citing *Block v. Rutherford*, 468 U.S. 576 (1984)). In addition, the district court found that the majority of courts which have considered the impact of *Hudson* upon *Bell* have limited *Hudson* to cell searches and have not extended *Hudson*'s ruling to the constitutionality of custodial strip searches. *Id*. (citations omitted). Likewise, the district court found that "*Turner* cited *Bell* with approval and did not at any point suggest that *Bell*'s approach to Fourth Amendment claims should no longer be controlling law." *Id*. at 448. Moreover, *Bell* specifically applied in a Fourth Amendment context of a strip search, while *Turner* challenged other polices under the First and Fourteenth Amendment, which are irrelevant here. Although the district court noted that both the Second and Ninth Circuit mention *Turner*'s analysis in custodial strip search cases, the district court was not persuaded by their use. *Id*. at 447-48 (citing *Michenfelder v. Sumner*, 860 F.2d 328 (9th Cir. 1988); *Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007); and *Shain v. Ellison*, 273 F.3d 56 (2d Cir. 2001).

In this case, Defendants mention *Turner* in their Memorandum of Law in Support of their Motion to Dismiss, however, they assert that "it is not necessary for this Court to evaluate these factors as to the WVRJA strip search policy" because *Bell* controls. *Memorandum of Law*, at 14; *see*

(continued...)

In applying *Bell* to the facts before it, the district court recognized that a vcs search constitutes an extremely invasive action by the government, and is "grossly disproportionate" when someone is arrested on a relatively minor offense. *Id*. at 452-53 (citations omitted). "Few people would think that their right of privacy in their own body, a 'cherished value of our society,' could be jeopardized by the failure to pay parking tickets, shoplifting, or driving without a license." *Id*. (citation omitted). However, it is exactly what occurs when a blanket policy in enforced. *Id*. The district court noted that "[c]ourts that strike down blanket strip search policies for detained arrestees conclude that the two justifications which supported the constitutionality of the MCC policy for contact visit strip searches are lacking in the arrestee context." *Id*. at 454 (citation omitted).

First, arrests and detention are usually "unplanned events," with little opportunity to smuggle contraband. *Id*. (citations and internal quotation omitted). In addition, it is likely that any contraband would be uncovered "during a valid search incident to arrest or a less intrusive custodial search." *Id*. (citations omitted). Moreover, when an individual is arrested on an offense that is not commonly associated with weapons, drugs, or other contraband, "the risk that an arrestee has secreted contraband in such a way that it could only be detected by a strip search shrinks further." *Id*. (citations omitted). Citing *Logan* and *Mary Beth G.*, the district court found that "[s]trip searching arrestees who are unlikely to possess, much less conceal, contraband does not serve the

---

[4](...continued)
*also Defendants' Reply in Support of its Motion to Dismiss*, at 15 (stating *"Bell* established the framework by which this court must evaluate the WVRJA policy and *Bell* remains the only precedent that this court should consider"). Plaintiff also argues that the *Hudson* and *Turner* standards are inapplicable. Upon review, this Court agrees with the parties that *Bell* controls this situation.

institutional security needs of a custodial facility." *Id*. at 454.  Second, the district court noted that, as arrests are typically unplanned, there is little deterrent effect as the Supreme Court found in *Bell*. *Id.* at 455; *see Bell*, 441 U.S. at 559.  Thus, the district court stated that "[t]hese considerations significantly weaken the effectiveness of a blanket arrestee strip search policy and, therefore, a custodial facility's justification for enforcing it." *Id*.  Balancing these considerations with the invasion of privacy involved in a strip search, and the need for security in custodial facilities, the district court agreed with the majority of courts which have determined that blanket strip search policies permitting "indiscriminate searches of arrestees simply do not satisfy the basic Fourth Amendment requirement of reasonableness because they subject too many people to highly invasive, humiliating searches that do not actually promote the institutional security interests of the custodial facility." *Id*. at 455 & 463.  Accordingly, the district court determined that the plaintiffs pled a viable claim under the Fourth Amendment. *Id*. at 463.


        In making its decision, the district court discussed the fact that, at the time, the Eleventh Circuit was the only circuit court of appeals which had determined it was constitutionally permissible to have a policy "of strip searching all arrestees as part of the process of booking them into the general population of a detention facility, even without reasonable suspicion to believe that they may be concealing contraband[.]" *Powell v. Barrett*, 541 F.3d 1298, 1300 (11th Cir. 2008).  In so holding, the Eleventh Circuit stated that "the security needs the Court in *Bell* found to justify strip searching an inmate re-entering the jail population after a contact visit are no greater than those that justify searching an arrestee when he is being booked into the general population for the first time." *Id.* at 1302.  In addition, the court noted the strip searches in *Bell* actually were more intrusive than

-14-

the ones challenged in the case before it.  Thus, the Eleventh Circuit found "[i]t follows from the *Bell* decision that the less intrusive searches in this case do not violate the Fourth Amendment." *Id.*

After briefing was complete in this case, a sharply divided Ninth Circuit in *Bull v. City and County of San Francisco*, 595 F.3d 964 (9th Cir. 2010), overruled its prior holdings and joined the Eleventh Circuit in finding that a policy requiring strip searches of all arrestees placed in the general jail population did not violate the Fourth Amendment. 595 F.3d at 982.  According to jail administrators, the policy in *Bull* was instituted because there was a serious problem of smuggling into the jail system. *Id.* at 966.  Jail administrators also "concluded that, based on their experience, 'the greatest opportunity for the introduction of drugs and weapons into the jail occurs at the point when an arrestee is received into the jail for booking and, thereafter, housing.'" *Id.* at 967.

Previously, in *Giles v. Ackerman*, 746 F.2d 614 (9th Cir. 1984) (per curiam),[5] the Ninth Circuit held that strip searches of an arrestee for a minor offense cannot be justified on the fact the arrestee will be placed in contact with the general inmate population.  Rather, it must be based upon individualized reasonable suspicion that the arrestee has contraband. 746 F.2d at 617.  In *Bull*, the majority found that conclusion was inconsistent with *Bell* as the Supreme Court made no such requirement.  "Rather, the Supreme Court upheld a policy of strip searching all persons who had contact visits as categorically reasonable under the circumstances in the detention facility. *Id.*

---

[5]*Overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1040 n. 1 (9th Cir. 1999 (en banc).

(citations omitted).  In addition, the Ninth Circuit in *Bull* disavowed its previous finding "that arrestees charged with minor offenses 'pose no security threat to the facility.'" 595 F.3d at 978 (citing *Giles*, 746 F.2d at 618) (footnote omitted).  Again, the Ninth Circuit stated that *Bell* made no such requirement and the Supreme Court said nothing about modifying the policy based upon the nature of inmate's underlying offense. *Id*.

Next, the Ninth Circuit found a record of smuggling was not necessary under *Bell* because of the deterrent effect a strip search policy may have. *Id.* at 979.  Lastly, the Ninth Circuit rejected its previous finding that arrests are normally unplanned events and, therefore, it is less likely that an arrestee has contraband than an inmate after a contact visit. *Id.*  In this respect, the majority agreed with Eleventh Circuit's reasoning in *Powell* which stated the fallacy in the "unplanned event" position is that many individuals know when officers are coming to arrest them on warrants, others voluntarily surrender to police, and some get themselves deliberately arrested.  In addition, even those arrested pursuant to a vehicle stop may have time to hide contraband before an officer reaches the vehicle. *Id*. at 980 (quoting *Powell*, 541 F.3d at 1313).  Accordingly, the majority found no meaningful distinction between the policy in *Bull* and the one in *Bell* and, therefore, upheld the policy.

In a sharply worded dissent, the minority stated there was absolutely no evidence in the record of any arrestee hiding contraband with the intent to smuggle it into jail.  Moreover, there was not anyone in the proposed class who was found to possess contraband when strip searched. *Id*. at 990.  Likewise, there is not even anecdotal support for the notion that some detainees get arrested

-16-

for the purpose of smuggling contraband into jail. *Id*. at 998-99. The dissent stated that all but the Eleventh Circuit rejected the majority's approach because "[s]uspicionless, routine, mandatory strip search policies flatly contradict the balancing of interests that the Supreme Court has instructed us to undertake." *Id*. at 991. The majority's holding simply legitimizes "abusive, unnecessary body cavity searches of those who pose no security risk." *Id*. The dissent emphasized the degrading nature of strip searches requires a strong justification by the government. *Id*. at 1001. However, in the case before it, the dissent found no justification for the policy, "aside from minor bureaucratic inconvenience. . . . Judicial review cannot be halted when the government's rationale is simply 'because I said so.' Under proper, deferential judicial review, . . . [the] body cavity search policy cannot pass constitutional muster." *Id*. In ending, the dissent pointedly stated that "[i]nvading the rights of everyone, regardless of whether we have reason to suspect them or not, should give no one illusory comfort that we are providing justice for all." *Id*. at 1004.[6]

Defendant contends that this Court should adopt the Eleventh Circuit's decision in *Powell*[7] as the policy there is substantially similar to the policy at issue here.[8] Defendant also asserts

---

[6]The dissent also strongly disagreed with the majority's suggestion that *Turner* may supplant *Bell*'s analysis. Although the majority did discuss the factors in *Turner*, it first concluded under *Bell* that the strip search policy was reasonable and therefore did not violate the class members' Fourth Amendment rights." *Id.* at 975. The majority then stated that "[b]ecause the *Turner* factors require us to give more deference to detention officials' determinations than does the balancing test in *Bell*, it is not surprising that our consideration of the *Turner* factors leads to the same conclusion." *Id.* at 975-76.

[7]Presumably, if the Court permitted additional briefing on the issue, Defendants also would argue the Court likewise should follow the decision in *Bull*.

[8]Defendants contend that the only difference in the policies is that the WVJRA policy requires searches be conducted in an area not visible to other inmates, prison employees not
(continued...)

the Court should disregard the cases from other jurisdictions because they are factually diverse and many merely challenge the particular conditions of a search rather than whether a policy, on its own, is constitutional.  Although the Court recognizes there is a wide variety of factual scenarios and legal challenges in the strip search cases cited by Plaintiff, the overarching theme of those cases is that *Bell*'s teaching requires "a detainee held on a misdemeanor charge not related to weapons or drugs may not be strip searched absent individualized reasonable suspicion that he or she is carrying such contraband." *Young v. County of Cook*, 616 F. Supp.2d 834, 846 (N.D. Ill. 2009); *see also Smith v. Montgomery County, Maryland*, 643 F. Supp. 435, 440 (D. Md. 1986) (stating "courts have found that strip searches of detainees arrested on minor offenses violate the Fourth Amendment").

Although the parties spend a great deal of time discussing cases from other jurisdictions and those discussions are helpful in framing and understanding the issues, in the end, this Court must be consistent with the Fourth Circuit's application of *Bell*.  In quoting *Bell*, the Fourth Circuit in *Logan* held:

> Strip searches of detainees are constitutionally constrained by due process requirements of reasonableness under the circumstances.  "In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."

---

[8](...continued)
involved in the search, or the public.  In *Powell*, the searches were conducted with up to forty other inmates.  541 F.3d at 1301.

-18-

660 F.2d at 1013 (quoting *Bell*, 441 U.S. at 559).  The Fourth Circuit then concluded that the Sheriff's *policy* of strip searching "all persons held at the Detention Center for weapons or contraband regardless of their offense" "was conclusively shown to be unconstitutional under the standards laid out in *Bell*[.]" 660 F.2d at 1010 & 1013.

Defendants argue, however, that the facts of *Logan* distinguish it from this case in that, unlike Plaintiff in this case, Ms. Logan was never intermingled with the general population.  Defendant argues intermingling with the general population increases the security risk and justifies the policy.  However, Plaintiff asserts the proposed class includes all individuals who were strip searched prior to being arraigned and, presumably, many of those individuals were released before being intermingled.[9]  Thus, they fall precisely in line with the facts in *Logan*.

Assuming, as this Court must for purposes of this motion to dismiss, the truth of Plaintiff's allegation that the policy applies broadly to all pretrial detainees regardless of whether they are intermingled, the policy strikes directly in the face of the policy struck down in *Logan*.  If true, the blanket nature of the policy clearly would be unconstitutional.  Nevertheless, Defendant argues that Plaintiff's claim cannot survive because reasonable suspicion existed to strip search him in this case.  Defendants make a number of factual allegations against Plaintiff which they assert warranted the search.  In his First Amended Class Action Complaint, Plaintiff alleges his "arrest was

---

[9]In paragraph 31 of the First Amended Class Action Complaint, Plaintiff alleges "[t]he strip searches and delousing discussed in this complaint are often imposed upon pre-trial detainees prior to their arraignment before a judge.  Upon information and belief, many members of the proposed class are bailed out of custody shortly after being arraigned." *First Amended Class Action Complaint*, at ¶ 31.

void of any reasonable suspicion that he harbored any weapons or contraband." *First Amended Class Action Complaint*, at ¶ 38, in part.[10]   Again, for purposes of a motion to dismiss, this Court must accept the truth of Plaintiff's allegations.   Having done so, the Court **DENIES** Defendant's motion to dismiss with respect to Plaintiff's challenge of the strip search policy.

**B.**
**The Delousing Policy**

The next issue the Court must address is whether Defendants' delousing policy is unconstitutional.   The Court recognizes there are few cases which discuss delousing policies and the parties cite none within this circuit.   In support of their motion, Defendants rely upon *Russell v. Richards*, 384 F.3d 444 (7th Cir. 2004).   In *Russell*, the Seventh Circuit was asked to consider whether a "jail's policy of directing that all incoming inmates to use a delousing shampoo violated their Fourteenth Amendment due process right to be free from unwanted medical treatment." 384 F.3d at 446.   The plaintiffs in *Russell* were minor, non-violent offenders who were arrested and taken to jail.   Upon arrival, incoming inmates were given a cup of Liceall and told to apply it to their scalp and then shower it out.   There was no monitoring of its use and no way to verify that the inmates actually used it.   In addition, although inmates were not told they can refuse to use it, the jail's position was that they may refuse. *Id.*

_____

[10]In addition, although Defendants contend that Plaintiff's arrest and actions on September 28, 2008, provided reasonable suspicion for the strip search, Plaintiff maintains that he was held at WVRJA facilities on multiple occasions and counsel has not had the opportunity to take any discovery into the circumstances of those other instances.   In addition, Plaintiff argues that he will demonstrate that the facts now cited by Defendants are nothing more than a *post hoc* effort to justify his strip search and delousing under the blanket policy.   Specifically, Plaintiff asserts that it is not even known yet whether the correctional officers knew what he was charged with when he entered the facility.   Plaintiff argues that these are all issues for which discovery is appropriate and which are more properly dealt with on a motion for summary judgment, not a motion to dismiss.

The jail administrators justified their policy on the grounds that they were trying to prevent lice infestations, which, if they occur, are difficult and time consuming to ameliorate. *Id.* However, the manner in which they attempted to prevent infestations through the policy had some serious flaws. In addition to the fact that there was no effort made to ensure incoming inmates actually used the delousing solution, the instructions for Liceall were not followed. For instance, inmates were never told they had to leave it on their hair for ten minutes and were not given a second application. In addition, inmates were not told to put Liceall on other parts of their bodies where lice may be present. *Id.* The instructions also cautioned that individuals allergic to ragweed could have a reaction, but inmates were never given this warning. *Id.* at 446-47.

In discussing the policy, the Seventh Circuit assumed without deciding that the application of Liceall constitute a medical treatment, which implicates an "inmate's constitutionally-protected interest in refusing unwanted medical treatment. *Id.* at 447 (citations and footnote omitted). The Seventh Circuit then proceeded to discuss the policy under the test announced in *Turner v. Safley*, 482 U.S. 78 (1987), to determine its reasonableness. The reasonableness test under *Turner* includes: (1) whether there is "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it[;]" (2) "whether there are alternative means of exercising the right that remain open to prison inmates[;]" (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally[;]" and (4) "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." 482 U.S. at 89-90 (citations omitted).

-21-

Analyzing factors (1), (3), and (4),[11] the Seventh Circuit found there was a satisfactory justification between the policy and the jail's justification for it despite the problems noted with how it was being administered. 384 F.3d at 448 & 450.  Specifically, the Seventh Circuit stated that if inmates were accommodated by being told they could refuse treatment, it could result in lice infestations. *Id*. at 448-49.  In addition, the Seventh Circuit found no evidence in the record as to the effectiveness or cost of directing examinations for lice prior to using the solution so that it only would be given to those actually infected.  Indeed, the Seventh Circuit observed that some inmates may consider a close examination of their hair more intrusive then just being given the treatment. *Id*. at 449.  Therefore, the Seventh Circuit concluded "the record  . . . [did] not support the conclusion that the jail's policy with respect to delousing shampoo amounts to an unreasonable intrusion on an inmate's constitutional rights." *Id*.

Plaintiff argues that *Russell* is distinguishable from this case because it was brought under the Fourteenth Amendment and the inmates were given the product to apply themselves and there was no monitoring by prison personnel.  To the contrary, Plaintiff points out he has filed a Fourth Amendment challenge to the policy and it involves prison officials spraying the product on naked detainees.  In support of his position that this policy is unconstitutional, Plaintiff cites *Doan v. Watson*, 168 F. Supp.2d 932 (S.D. In. 2001).[12]

---

[11]The Seventh Circuit stated that factor number 2 is irrelevant in the context of involuntary medical treatment. *Id*. at 448 n. 2 (citing *Washington v. Harper*, 494 U.S. 210 (1990)).

[12]Plaintiff also cites *Wilson v. County of Gloucester*, 256 F.R.D. 479 (D. N.J. 2009), and *Gwiazdowski v. County of Chester*, 263 F.R.D. 178 (E.D. Pa. 2009).  In *Wilson*, the district court found common issues of law and fact for class action purposes exist as to the purpose of supervised (continued...)

In *Doan*, individuals arrested on misdemeanor offenses were strip searched, sprayed with a delousing solution, and then told to shower. 168 F. Supp.2d at 933.  The district court found "the delousing procedure included the essential elements of the strip search" and, therefore, the Fourth Amendment and *Bell*'s reasonableness test applied. *Id.* at 936.  Finding the strip searches in *Doan* "closely resemble the searches at issue in *Mary Beth G.*, the district court found the defendants failed to "demonstrate[] any factual basis to relate the blanket strip search policy to legitimate security interests." *Id.* at 936.  Without any further discussion about the reasonableness under *Bell* of the delousing policy, the district court found it violated the Fourth Amendment right against unreasonable searches. *Id.* at 937.

As the current action challenges the delousing policy on Fourth Amendment grounds, the Court finds that the reasonableness test in *Bell* is more relevant than the test announced in *Turner*.  However, there is no record in this case upon which this Court can apply *Bell*'s test.  Based upon Plaintiff's allegations, the delousing policy was a blanket policy which applied to pretrial detainees prior to arraignment with some of those detainees presumably being released without ever being housed with the general population.  At first glance, a court may sweep this challenge up with the strip search challenge and declare it unreasonable.  However, such result does not take into account that Defendants should be given the opportunity to present evidence and arguments

---

[12](...continued)

shower and delousing policies. 263 F.R.D. at 486.  In *Gwiazdowski*, the district court found the delousing policy, which required a visual inspection of the inmate for wounds and sores, a strip search.  Nevertheless, it did not decide whether the policy violated the Fourth Amendment's reasonableness standard.  It stated its finding was only relevant for class certification purposes, and it did not bind the finder of fact on the merits. 263 F.R.D. at 186.

justifying the delousing policy on its own merits.[13]  The Court will not sit and ponder all the possible justifications and evidence that Defendants may cite in support of its delousing policy.  Suffice it to say, the Court believes it is necessary to independently examine the reasonableness of the delousing policy.[14]   Therefore, the Court **DENIES** Defendants' motion to dismiss Plaintiff's challenge of this policy.

## C.
## Immunity

Defendants further assert that Plaintiff's claims against them are barred under the Eleventh Amendment and *Will v. Michigan Department of State Police*, 491 U.S. 58 (1989).  In *Will,* the Supreme Court stated "that neither a State nor its officials acting in their official capacities are 'persons' under § 1983." 491 U.S. at 71.  It is well established that the WVRJA is an agency of the State of West Virginia and is not a "person" within the meaning of § 1983 for purposes of an action seeking money damages. *See Roach v. Burke*, 825 F. Supp. 116, 118 (N.D. W. Va. 1993) (holding that the WVRJA is not a person amenable to suit under § 1983); *see also Lavender v. West Virginia Reg'l Jail Auth. and Corr. Facility Auth.*, No. 3:06-1032,  2008 WL 313957 (S.D. W. Va. 2008) (same).  "An individual defendant employed . . . [by the WVRJA] and sued in his official capacity is also immune from suit in federal court under the Eleventh Amendment." *Edwards v. West*

---

[13]For instance, the Court can imagine Defendants may attempt to distinguish delousing from a search for weapons on the basis that, merely because someone is arrested on a misdemeanor, it does not mean they are any less likely to have lice as some courts have held is the situation in searching for weapons and other contraband.

[14]To be clear, the Court is not saying that a detainee being nude in front of a prison official is not a factor the Court will consider in weighing the reasonableness of the delousing policy. However, it is but one of the many factors the Court must consider in applying the reasonableness test.

*Virginia*, No. 2:00-0775, 2002 WL 34364404 (S.D. W. Va. 2002).  Thus, a claim for money damages against these Defendants acting in their official capacity is barred by the Eleventh Amendment. *See Gillette v. West Virginia*, No. Civ. A. 2:01-1309, 2003 WL 23522062 (S.D. W. Va. June 6, 2003) (holding the WVRJA "is an agency of the State . . . . [and] [a] . . . suit for money damages is barred by the Eleventh Amendment").

However, as pointed out by Plaintiff, he has not filed any claims for monetary relief under § 1983 against Defendants in their official capacities.  Rather, his claims against both Defendants in their official capacities are for declaratory judgment and injunctive relief.  The Supreme Court in *Will* very clearly held that "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Will*, 491 U.S. at 71 n.10 (citation omitted); *see also Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (stating "[t]o ensure the enforcement of federal law, however, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law").  Accordingly, the Court **DENIES** Defendants' Motion to Dismiss Plaintiff's claims against them in their official capacities.

Defendant Miller also moves to dismiss the claim against him in his individual capacity on the basis of qualified immunity.  Defendant Miller asserts that it is clear the allegations against him are made for actions he took in furtherance of his official duties and not because he, in his individual capacity, deprived Plaintiff of any rights.  However, the Eleventh Amendment does not bar suits under § 1983 for money damages against defendants sued in their individual capacities

-25-

merely because "the alleged wrongdoing was conducted while in performance of their official capacity." *Roach*, 825 F. Supp. at 118; *Hafer v. Melo*, 502 U.S. 21, 27 (1991) (rejecting the petitioner's argument that "[u]nder *Will*, . . . state officials may not be held liable in their personal capacity for actions they take in their official capacity").  The doctrine of qualified immunity, however, does protect public officials performing discretionary functions from civil liability if they can show that their conduct did "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne*, 526 U.S. 603, 609 (1999); (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

The threshold question a court must answer when qualified immunity is raised is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001).[15]  If the answer to this question is no, the inquiry ends. *Id*.  If, on the other hand, the answer is yes, then the court must determine whether the right was clearly established in the specific context of the case. Id.

In this case, there are two alleged actions which the Court will address separately for qualified immunity purposes.  The first action is the actual strip search.  As discussed above, taking Plaintiff's allegations as true, the Court has no difficulty finding the strip search policy violates a

---

[15]Although it often will be appropriate to conduct the qualified immunity analysis by first determining whether a constitutional violation occurred and by next determining whether the constitutional right was clearly established, the order of that two-step protocol is no longer mandatory. *Pearson v. Callahan*, 129 S. Ct. 808 (2009) (overruling *Saucier*).

constitutional right and such right was clearly established under *Logan*.  As governmental officials are held to have "presumptive knowledge of and respect for 'basic, unquestioned constitutional rights,'" and may be liable for constitutional violations when they "'knew or reasonably should have known'" their actions violated those rights,[16] the Court **DENIES** Defendant Miller's Motion to Dismiss with respect to the strip search policy.

The second action is the delousing policy.  As mentioned above, there are very few cases which discuss delousing policies and there do not appear to be any cases on point within the Fourth Circuit.  Thus, even if the Court were to presume at this point in the litigation that the delousing policy violates a constitutional right, the Court finds it highly unlikely that a reasonable person would have notice of that violation.  Nevertheless, as the Court has denied Defendants' Motion to Dismiss with respect to the delousing policy, the Court also **DENIES** Defendant Miller's qualified immunity argument with respect to this policy.  The Court believes this issue is best resolved after the Court decides the underlying issue regarding the policy itself, which will give both parties the opportunity to present evidence and arguments in support of their positions. *See Amaechi v. West*, 237 F.3d 356, 362-63 (2001) (stating that the concept of "clearly established" includes those rights previously adjudicated and "those manifestly included within more general applications of the core constitutional principle invoked" which would provide notice to a reasonable person in the official's position that certain conduct violates those rights (citations and internal quotation marks omitted)).

---

[16]*Harlow*, 457 U.S. at 815 (quoting *Wood v. Strickland*, 420 U.S. 308, 322 (1975) (emphasis in *Harlow* deleted).

**D.**
**The PLRA**

Defendants further argue Plaintiff's action must be dismissed because he failed to exhaust his administrative remedies under the Prison Litigation Reform Act (PLRA).  Section 1997e(a) of the PLRA provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  However, Plaintiff was no longer an inmate at the time he filed this action. Therefore, the PLRA is not applicable. *See Cofield v. Bowser*, 247 Fed. Appx. 413, 414, 2007 WL 2710423, *1 (4th Cir. 2007) (unpublished) (stating because the plaintiff "was not a prisoner when he filed his complaint, the PLRA exhaustion requirement is not applicable to his § 1983 action.  A former inmate who has been released is no longer 'incarcerated or detained' for the purposes of § 1997e(h) and therefore does not qualify as a 'prisoner' subject to the PLRA"); *Shembo v. Bailey*, No. 3:07cv543-RJC, 2009 WL 129974, *2 (W.D. N.C. Jan. 20, 2009) (same).  Accordingly, the Court **DENIES** Defendants' motion on exhaustion grounds.

**III.**
**CONCLUSION**

Accordingly, for the foregoing reasons, the Court **DENIES** Defendants' Motion to Dismiss.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:          August 5, 2010

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE