IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

MICHAEL CANTLEY and FLOYD TETER,
on behalf of themselves and on behalf a Class
of others similarly situated,

                Plaintiffs,

v.                                               CIVIL ACTION NO. 3:09-0758

THE WEST VIRGINIA REGIONAL JAIL AND
CORRECTIONAL FACILITY AUTHORITY;
TERRY L. MILLER, both individually and in his
official capacity as Executive Director of the
West Virginia Regional Jail and Correctional
Facility Authority; JOSEPH A. DELONG,
both individually and in his official capacity as
Executive Director of the West Virginia Regional
Jail and Correctional Facility Authority; and
LARRY PARSONS, both individually and in his
official capacity as Executive Director of the
West Virginia Regional Jail and Correctional
Facility Authority.

                Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is a Renewed Motion to Dismiss Plaintiffs' Third Amended Complaint by Defendants The West Virginia Regional Jail and Correctional Authority (WVRJA) and Terry L. Miller, Joseph A. DeLong, and Larry Parsons, all in their individual and official capacities as the Executive Directors of the WVRJA. ECF No. 95. For the following reasons, the Court **DENIES** the motion.

# I.
# FACTUAL AND PROCEDURAL HISTORY

This action was filed on July 1, 2009, by Plaintiff Michael Cantley, individually and on behalf of a Class of others similarly situated, against the WVRJA and Mr. Miller. In his First Amended Class Action Complaint filed on October 9, 2009, Plaintiff asserted he was arrested on or about September 28, 2008, on non-felony charges and was required to undergo a visual cavity strip search (vcs)[1] and delousing pursuant to a WVRJA policy. Plaintiff Cantley claimed that the WVRJA policy of strip searching and delousing pretrial detainees charged with misdemeanors or other minor crimes is unconstitutional under the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983.

Defendants WVRJA and Mr. Miller filed a motion to dismiss. On August 5, 2010, the Court denied the motion. *Cantley v. W. Va. Reg'l Jail and Corr. Fac. Auth.*, 728 F. Supp.2d 803 (S.D. W. Va. 2010). Discovery proceeded in this case until June 1, 2011, when the Court signed the parties' proposed stipulation to stay further proceedings in this matter until after the United States Supreme Court issued a decision in *Florence v. Board of Chosen Freeholders*, another strip search case. The Supreme Court issued its decision on April 2, 2012. *Florence v. Board of Chosen Freeholders*, 132 S. Ct. 1510 (2012). In the interim period, the Court permitted Floyd Teter to be

---

[1] "A 'strip search,' though an umbrella term, generally refers to an inspection of a naked individual, without any scrutiny of the subject's body cavities. A 'visual body cavity search' extends to visual inspection of the anal and genital areas. A 'manual body cavity search' includes some degree of touching or probing of body cavities." *Blackburn v. Snow*, 771 F.2d 556, 561 n. 3 (1st Cir. 1985) (citation omitted).

added as a class representative in a Second Amended Complaint. ECF Nos. 65 & 66. Mr. Teter also alleges that he was arrested on non-felony charges, subjected to a visual cavity search, and sprayed with a delousing solution prior to being arraigned.

In light of the Supreme Court's decision in *Florence*, the Court permitted Plaintiffs to amend and file a Third Amended Complaint, in which Defendants DeLong and Parsons were added. ECF No. 89. The Court also entered a new Scheduling Order. Thereafter, Defendants filed the current motion to dismiss the Third Amended Complaint.

## II.
## STANDARD OF REVIEW

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the United States Supreme Court disavowed the "no set of facts" language found in *Conley v. Gibson*, 355 U.S. 41 (1957), which was long used to evaluate complaints subject to 12(b)(6) motions. 550 U.S. at 563. In its place, courts must now look for "plausibility" in the complaint. This standard requires a plaintiff to set forth the "grounds" for an "entitle[ment] to relief" that is more than mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 555 (internal quotation marks and citations omitted). Accepting the factual allegations in the complaint as true (even when doubtful), the allegations "must be enough to raise a right to relief above the speculative level . . . ." *Id*. (citations omitted). If the allegations in the complaint, assuming their truth, do "not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Id*. at 558 (internal quotation marks and citations omitted).

In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court explained the requirements of Rule 8 and the "plausibility standard" in more detail. In *Iqbal*, the Supreme Court reiterated that Rule 8 does not demand "detailed factual allegations[.]" 556 U.S. at 678 (internal quotation marks and citations omitted). However, a mere "unadorned, the-defendant-unlawfully-harmed-me accusation" is insufficient. *Id*. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. (quoting *Twombly*, 550 U.S. at 570). Facial plausibility exists when a claim contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citation omitted). The Supreme Court continued by explaining that, although factual allegations in a complaint must be accepted as true for purposes of a motion to dismiss, this tenet does not apply to legal conclusions. *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. (citation omitted). Whether a plausible claim is stated in a complaint requires a court to conduct a context-specific analysis, drawing upon the court's own judicial experience and common sense. *Id*. at 679. If the court finds from its analysis that "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.'" *Id*. (quoting, in part, Fed. R. Civ. P. 8(a)(2)). The Supreme Court further articulated that "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id*.

## III.
## DISCUSSION

In *Florence*, the Supreme Court was asked to decide whether all detainees who are admitted to the general jail[2] population may be required to undress and submit to a close visual inspection. 132 S. Ct. at 1513. The case before it involved Albert W. Florence who was arrested on an outstanding warrant, which inexplicitly remained in a computer database despite the fact the underlying reason for the warrant was resolved. *Id*. at 1514. Upon his arrest, Mr. Florence was confined at the Burlington County Detention Center in New Jersey for six days and then was transferred to the Essex County Correctional Facility. *Id*.

Pursuant to the procedures at the Burlington County jail, every arrestee was required "to shower with a delousing agent." *Id*. As an arrestee disrobed, officers also would examine the individual "for scars, marks, gang tattoos, and contraband[.]" *Id*. Mr. Florence further claimed he was directed "to open his mouth, lift his tongue, hold out his arms, turn around, and lift his genitals[,]" although it was not clear whether these requirements were normal practice. *Id*. (citations omitted). During his detention, Mr. Florence "shared a cell with at least one other person and interacted with other inmates[.]" *Id*. at 1513.

Similarly, when Mr. Florence was transferred to the Essex County Correctional Facility, he was placed in a holding cell, instructed to disrobe, and subjected to a visual inspection "for body markings, wounds, and contraband" and "an officer looked at their ears, nose, mouth, hair,

---

[2] The Supreme Court used a broad meaning of the word "jail" to include prisons and detention facilities. *Id*.

5

scalp, fingers, hands, arms, armpits, and other body openings" without touching him. *Id*. at 1514 (citation omitted). "This policy applied regardless of the circumstances of the arrest, the suspected offense, or the detainee's behavior, demeanor, or criminal history." *Id*. Mr. Florence then was required to shower (while his clothes were inspected) and, thereafter, he was admitted to the Essex facility. Mr. Florence was released the following day, after the charges were dismissed. *Id*.

Mr. Florence brought an action challenging the policy requiring close visual inspections of those arrested of minor offenses, without any reason to believe the arrestee was harboring weapons, drugs, or contraband. *Id.* at 1514-15. The district court certified a class and, after discovery, ruled on summary judgment that the policy violated the Fourth Amendment. *Id*. at 1515. The United States Court of Appeals for the Third Circuit reversed, finding the procedure "struck a reasonable balance between inmate privacy and the security needs of the two jails." *Id*. (citation omitted). The Third Circuit premised its finding that the searches occurred prior to an arrestee's admission into the general population, and Mr. Florence did not dispute this premise. *Id*.

In ruling on the constitutionality of the policy, the Supreme Court acknowledged the difficulties in operating and maintaining safety in detention facilities, which "requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face." *Id*. (citation omitted). The Supreme Court emphasized its position of giving deference to correctional authorities and upholding regulations that impinge upon the constitutional rights of inmates if they are "'reasonably related to legitimate penological interests.'" *Id*. (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987) (other citations omitted)). In addition, the Supreme Court

6

recognized there is no mechanical test to determine the reasonableness of an intrusion into an inmate's privacy. *Id*. at 1516 (citing *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). Rather, "[t]he need for a particular search must be balanced against the resulting invasion of personal rights." *Id*. (citing *Bell*, 441 U.S. at 559).

Utilizing this balancing test, the Supreme Court upheld "[p]olicies designed to keep contraband out of jails and prisons[.]" *Id*. (citing *Block v. Rutherford*, 468 U.S. 576 (1984) (banning contact visits); *Hudson v. Palmer*, 468 U.S. 517 (1984) (upholding random searches of inmates' lockers and cells)). "These cases establish that correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." *Id*. at 1517 (citation omitted). In addition, the reasonableness of a policy, when juxtaposed to legitimate security concerns, lies within the realm and expertise of those officials. Further, the Supreme Court repeatedly admonished that "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations courts should ordinarily defer to their expert judgment in such matters." *Id*. (citations omitted).

Applying this standard, the Supreme Court stated that admitting new detainees to the inmate population creates numerous risks to staff, other inmates, and the new detainee. *Id*. at 1518. Thus, given that facilities "are often crowded, unsanitary, and dangerous places," there is a significant interest on the part of correctional officials to conduct a thorough search during the intake process. *Id.* at 1520. Specifically, the Court stated that "[t]he danger of introducing lice or contagious infections, for example, is well documented." *Id*. at 1518 (citations omitted). Likewise,

the Court noted that visually inspecting tattoos to identify gang affiliation is a reasonable requirement during the intake process to protect everyone at the facility. *Id*. at 1519. Moreover, screening for contraband during intake is the most serious duty officials have, and some inmates who may be believed to be the lowest risk are actually dangerous criminals and are caught bringing contraband into jail. *Id*. at 1519-20. The Court noted that, not only do those arrested for minor offenses have the same incentive to conceal contraband, but they may be coerced to hide contraband if it is known they are not subject to the same searches as others. Therefore, to carve out an exception to a standard search protocol for those arrested for minor offenses opens the door for those arrestees to being asked or coerced into bringing contraband into the facilities because it will be well known they will not be searched. *Id*. at 1520-21.

In addition, the Court recognized that, practically speaking, it may be difficult to make inmate classifications based upon current and prior offenses before an intake search is conducted. *Id*. at 1521. Moreover, in the case before it, criminal history records were not available to the intake officers conducting searches and, even if they were available, they may be inaccurate or incomplete. *Id*. (citations omitted). Without reliable information about the arrestees' records, the Court found "it would be illogical to require officers to assume the arrestees in front of them do not pose a risk of smuggling something into the facility." *Id*. Furthermore, even if reliable records are available, requiring officers to make quick decisions on whether the arrestee's record requires a search raises serious difficulties with implementation and opens the door to potential charges of discrimination. *Id*. at 1521-22 (citation omitted). Therefore, for all of these reasons, the Court affirmed the Third Circuit's decision finding the procedure was a reasonable balance between the

8

need for security and inmate privacy. *Id.* at 1523. In doing so, the Court specifically stated it was not ruling on a situation in which the arrestee's detention had "not yet been reviewed by a magistrate or other judicial officer, and who can be held in available facilities removed from the general population[.]" *Id*. at 1523. In addition, in their concurring opinions, both Chief Justice Roberts and Justice Alito emphasized that the Court was not foreclosing the possibility of an exception when a detainee has been arrested for a minor offense, the detention has not yet been reviewed by a judicial officer, and the detainee may be placed in an alternative facility away from the general inmate population. *Id.* at 1523-24.

In response to the *Florence* decision, Plaintiffs in the present case filed their Third Amended Class Action Complaint in an attempt to conform their claims to the holding in *Florence*. Plaintiffs allege the WVRJA has a blanket policy requiring all pretrial detainees, who have not been before a judicial officer, be strip searched, deloused, and placed in jail clothing regardless of their offense. *TAC*, at 2. Specifically, Plaintiff Michael Cantley asserts he was arrested on September 28, 2008, on non-felony charges of violating a domestic violence protection order. Plaintiff Cantley states he was at his former wife's house in violation of the order, but he did not harm her or anyone else while there. Plaintiff was arrested, taken into custody, and placed in a holding cell at the Western Regional Jail.

Plaintiff Cantley claims that, after several hours of custody in a holding cell, he was required to undergo a "strip search"[3] and delousing pursuant to a WVRJA policy. Although Plaintiff Cantley claims his arrest was void of any reasonable suspicion he possessed any weapons or contraband or harbored lice, the policy required him to completely disrobe in front of a correctional officer for a visual inspection. During the inspection, Plaintiff Cantley had to lift his arms and legs, spread his butt cheeks, lift up his testicles and bend at the waist. The correctional officer then sprayed a delousing solution on him and required him to shower in view of the officer. Plaintiff Cantley was then issued prison clothing, and he remained incarcerated for over a month, until on or about November 6, 2008, when all charges against him were dismissed.

Plaintiff Teter was arrested on February 19, 2010, "on non-felony charges of putting materials on a highway and obstructing an officer." *Id*. at ¶53. According to Plaintiff Teter, he was arrested after using "a tractor moving snow in the vicinity of a road, and was arrested in a Church parking lot after driving his tractor there." *Id*. at ¶54. Like Plaintiff Cantley, he asserts "his arrest was void of any reasonable suspicion that he harbored any weapons, contraband, or lice." *Id*. After his arrest, Plaintiff Teter was treated for back injuries at a hospital and then ultimately placed in a holding cell at the Tygart Valley Regional Jail. *Id*. at ¶55. Plaintiff Teter claims he was held in the holding cell for several hours and then strip searched, sprayed with the delousing solution, and

---

[3]In their Third Amended Complaint, Plaintiffs define their use of the phrase "strip search" to include a vcs and a requirement that the detainees "manipulate body parts to allow for an inspection of these private areas." *Id*. at ¶29. In addition, Plaintiffs claim that "some members of the Proposed Class (not including the Plaintiffs) are also required to undergo physical cavity searches upon entry to the custody of the WVRJA, where a Correctional Officer inserts a gloved finger into the rectum of a detainee to search for contraband." *Id*. at ¶30.

required to shower prior to being arraigned. He describes his strip search as being identical to that of Plaintiff Cantley. Plaintiff Teter states he was released from custody the next day on his own recognizance, shortly after being arraigned.[4]

With respect to delousing, Plaintiffs claim that correctional officers receive no medical training in applying the delousing solution and the policy is enforced without any medical evaluation to determine if lice are present. Based upon information and belief, Plaintiff further asserts that the WVJRA uses "Liceall," which Plaintiff alleges is a caustic solution that can, and often does, cause chemical burns, especially when applied to African-Americans. However, neither Plaintiff Cantley nor Plaintiff Teter claim they personally suffered any chemical burns. In addition, Plaintiffs assert that a one-time treatment with Liceall, without further medical care, is ineffective as a cure for lice.

Plaintiffs argue the strip search policy as applied to pretrial detainees charged with misdemeanors or other minor crimes, absent some particularized suspicion, and prior to judicial process to contest their detention violates the Fourth Amendment and 42 U.S.C. § 1983. In addition, they assert that the delousing policy as applied to all detainees charged with misdemeanors and other minor crimes, irrespective of whether they were arraigned, violates the Fourth Amendment and § 1983. As a result of these policies, Plaintiffs claim to have suffered psychological pain, humiliation, suffering, and mental anguish. Although Plaintiffs' first and second causes of actions

---

[4]Plaintiff Teter actually states he was arrested on February 19, 2010, and released after his arraignment on February 20, 2011. The Court believes that one of the years is a typographical error given that it is unlikely his arraignment occurred over a year after his arrest.

are labeled as being "against the individual Defendants in their individual capacities," Plaintiffs' Prayer for Relief only seeks "judgment against Director Miller in his individual capacity, on Plaintiffs' First and Second Causes of Action . . ., awarding compensatory damages to Plaintiffs and each Member of the Proposed Class . . . ." *TAC*, at 23 ¶2. In addition, Plaintiffs seek declaratory and injunctive relief against all Defendants that the policies are unconstitutional and violates their right to privacy. On the other hand, Defendants contend that the strip search policy and the delousing procedures are necessary for safety and health reasons. Thus, Defendants argue the policies are not constitutionally defective and, in any event, they are entitled to qualified immunity.

Defendants assert they are entitled to qualified immunity on the strip search issue because their conduct did "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Under the doctrine of qualified immunity, a court first asks: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the answer is no, the inquiry ends. *Id*. On the other hand, if the answer is yes, then the Court must decide if it was a clearly established right within the context of the case. *Id*.[5]

Considering the factual allegations in the Third Amended Complaint in the light most favorable to Plaintiffs in this case, the Court shall assume (without deciding) that both Plaintiffs

---

[5]The order of the two-step protocol is no longer mandatory, but it often will be conducted in this order. *Pearson v. Callahan*, 555 U.S. 223 (2009) (overruling *Saucier*).

were arrested for minor crimes and strip searched and subject to delousing prior to appearing before a judicial officer without any reasonable suspicion that either harbored contraband, weapons, or lice. The problem in this case in deciding the first question under *Saucier*, however, is that there is no mention in the Third Amended Complaint as to whether or not either Plaintiff was in close contact with other detainees or inmates or admitted into the general population of the facility and, if so, were there any reasonable alternatives to such placement. Clearly, under *Florence*, a detainee's access and contact to other inmates is an important factor for this Court to consider in weighing the reasonableness of Defendants' actions against Plaintiffs' rights. Therefore, at this point, the Court simply does not have sufficient information to rule on whether Defendants' conduct violated a constitutional right. *See Saucier,* 533 U.S. at 201.

Defendants argue, however, that even if Plaintiffs were released from custody prior to being placed in a general housing unit, the Supreme Court in *Florence* made it clear it was not deciding whether a strip search under those circumstances would be reasonable. Therefore, Defendants insist they did not violate any "clearly established statutory or constitutional rights of which a reasonable person would have known" and , therefore, they are entitled to immunity. *Wilson*, 526 U.S. at 609 (citation omitted).

Although it is true *Florence* did not rule on this precise issue, the Fourth Circuit established long ago that it is unconstitutional to have an indiscriminate policy of strip searching a detainee who was not intermingled into the general population, who did not commit an offense commonly associated with possession of a weapon or contraband, who gave no reason to believe

13

she possessed a weapon or contraband, and who was detained for a short amount of time prior to release. *Logan v. Shealy*, 660 F.2d 1007, 1013 (4th Cir. 1981).[6] The Supreme Court in *Florence* very specifically stated it was not ruling on the reasonableness of searches where a detainee was not assigned to the general inmate population or in substantial contact with other detainees. 132 S. Ct. at 1523. As mentioned above, this limitation in *Florence* was echoed by Chief Justice Roberts and Justice Alito in their separate concurring opinions. Clearly, the Supreme Court left the door open to the possibility of finding a constitutional violation under these more narrow circumstances. Thus, as *Florence* did not overrule the Fourth Circuit's decision in *Logan* in this regard, it remains clearly established within the Fourth Circuit that such searches are unconstitutional. Assuming these limited facts, the decision in *Florence* does nothing to change the legal landscape in the Fourth Circuit. Therefore, at this point, Defendants are not entitled to qualified immunity with respect to the strip search and the Court **DENIES** Defendants' motion with respect to the strip search claims. *Compare Jones v. Murphy*, Civil No. CCB-05-1287, 2013 WL 822372, *6 (D. Md. Mar. 5, 2013) (granting immunity to individual defendant wardens on the grounds that *Florence* overruled some aspects of Fourth Circuit law and "left the contours of any 'exception' that would apply to the plaintiffs in this case unclear and open to debate").

Turning next to the delousing issue, this Court fully explained in its earlier Memorandum Opinion and Order that whether or not the delousing policy violated Plaintiffs' constitutional rights is a matter upon which the Court will withhold judgment until after Defendants

---

[6] This Court fully discussed the holding in *Logan* in its decision resolving Defendants' first motion to dismiss. *Cantley v. W. Va. Reg'l Jail and Corr. Auth.*, 728 F. Supp.2d at 809-815.

are "given the opportunity to present evidence and arguments justifying the delousing policy on its own merits." *Cantley*, 728 F. Supp.2d at 817. Defendants nevertheless argue they should be granted qualified immunity on this issue because they did not violate any "clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson*, 526 U.S. at 609 (citation omitted).

Again, the Court finds that, under the particular circumstances of this case, this issue is one best resolved after discovery because there are numerous scenarios that may warrant or not warrant immunity. As stated in dicta in *Florence*, "[t]he danger of introducing lice . . . is well documented." 132 S. Ct. at 1518 (citations omitted). Thus, it is conceivable that immunity may be appropriate if detainees entering the general inmate population, or who are in close contact with other detainees, are subject to delousing to prevent a potential outbreak. On the other hand, a court may decide that a reasonable official would not believe it is constitutional to have a detainee remove his clothes and get sprayed with a delousing solution when that detainee has no indications of having lice, is never integrated with other detainees or in the general inmate population, and is released from custody within a few hours. *See Amaechi v. West*, 237 F.3d 356, 362-63 (4th Cir. 2001) (stating that the concept of "clearly established" includes those rights previously adjudicated and "those manifestly included within more general applications of the core constitutional principle invoked" which would provide notice to a reasonable person in the official's position that certain conduct violates those rights (citations and internal quotation marks omitted)). The Court is not indicating how it would rule on these different scenarios, but it is merely demonstrating the breath of

possibilities and how it may impact whether a reasonable person in Defendants' position would believe the conduct violated the constitutional rights of the detainee.

In the instant case, the Court simply does not know whether either named Plaintiff was integrated with other inmates or what specific justifications Defendants may have for the policy. Although the Court is mindful that decisions on immunity ordinarily should be decided early in litigation,[7] the Court does not have enough information at this point to rule on the issue and finds a decision would be premature. Moreover, even if the Court would find qualified immunity for the individual Defendants exists, Plaintiffs also request injunctive relief which is not barred by qualified immunity so discovery on the constitutionality of spraying Plaintiffs' with a delousing solution will still proceed. *See Williams v. Ozmint*, No. 11–6940, 2013 WL 1987231, *5 (May 15, 2013) ("The defense of qualified immunity has no bearing, however, on claims for prospective court action such as injunctive relief." (citations omitted)). Therefore, the Court **DENIES** Defendants' motion to dismiss Plaintiffs' claims with respect to the delousing policy.

In their motion, Defendants further argue that Plaintiffs' proposed classes must be reformulated under *Florence* to exclude those individuals who were placed into a general housing unit.[8] As Plaintiffs' have not yet requested class certification and the parties have not fully briefed

---

[7]*See Hunter v. Bryant*, 502 U.S. 224, 227 (1991) ("stress[ing] the importance of resolving immunity questions at the earliest possible stage in litigation"(citations omitted)).

[8]Plaintiffs propose to represent the following two classes and a subclass of detainees:

(continued...)

[8](...continued)

**CLASS ONE:**

All persons who have been or will be placed into the custody of the West Virginia Regional Jail System, after being charged with misdemeanors, summary violations, violations of probation, traffic infractions, civil commitments or other minor crimes and were or will be deloused upon their entry into the West Virginia Regional Jail System, pursuant to the policy, custom and practice of the West Virginia Regional Jail and Correctional Facility Authority. The class period commences on June 30, 2007 and extends to the date on which the West Virginia Regional Jail and Correctional Facility Authority is enjoined from, or otherwise ceases, enforcing its policy, practice and custom of conducting the uniform delousing of pre-trial detainees. Specifically excluded from the class are Defendants and any and all of their respective affiliates, legal representatives, heirs, successors, employees or assigns.

**CLASS TWO**

All persons who have been or will be placed into the custody of the West Virginia Regional Jail System after being charged with misdemeanors, summary violations, violations of probation, traffic infractions, civil commitments or other minor crimes were or will be strip searched upon their entry into the West Virginia Regional Jail System prior to their being arraigned or provided with an appropriate initial court appearance to contest their detention prior to being searched, pursuant to the policy, custom and practice of the West Virginia Regional Jail and Correctional Facility Authority. The class period commences on June 30, 2007 and extends to the date on which the West Virginia Regional Jail and Correctional Facility Authority is enjoined from, or otherwise ceases, enforcing its policy, practice and custom of

(continued...)

those issues and/or any standing issues Defendants may have with respect to the named Plaintiffs, the Court will not rule on whether any class identified by Plaintiffs can survive *Florence* or whether the classes need to be modified until after those issues are fully presented to the Court.

---

[8](...continued)
conducting the uniform strip searches of pre-trial detainees prior to their being provided with an initial appearance to contest their detention. Specifically excluded from the class are Defendants and any and all of their respective affiliates, legal representatives, heirs, successors, employees or assignees.

**SUB-CLASS A**

All persons who have been or will be into the custody of the Central, Potomac Highlands or Tygart Valley Regional Jails after being charged with misdemeanors, summary violations, violations of probation[,] traffic infractions, civil commitments or other minor crimes were or will be strip searched upon their entry into these Regional Jails prior to their being arraigned or provided with an appropriate initial court appearance to contest their detention prior to being searched, pursuant to policy, custom and practice of the West Virginia Regional Jail and Correctional Facility Authority. The class period commences on June 30, 2007 and extends to the date on which the West Virginia Regional Jail and Correctional Facility Authority is enjoined from, or otherwise ceases, enforcing its policy, practice an custom of conducting the uniform strip searches of pre-trial detainees prior to their being provided with an initial appearance to contest their detention. Specifically excluded from the class are Defendants and any and all of their respective affiliates, legal representatives, heirs, successors, employees or assignees.

*TAC*, at ¶11.

## IV.
## CONCLUSION

Accordingly, for the foregoing reasons, the Court **DENIES** Defendants' Renewed Motion to Dismiss Plaintiffs' Third Amended Complaint. ECF No. 95. Given this ruling, the Court further **GRANTS** Plaintiffs' Motion and Request for a Status Conference with the Court. ECF No. 102. The Court **SCHEDULES** a telephone conference to be held on **Tuesday, June 11, 2013 at 11:00 a.m.** to discuss discovery and scheduling issues. The Court **DIRECTS** counsel for Plaintiffs to initiate the call with counsel for Defendants and the Court.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER: May 30, 2013

_____
ROBERT C. CHAMBERS, CHIEF JUDGE