IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

MICHAEL CANTLEY and FLOYD TETER,
on behalf of themselves and on behalf  a Class
of others similarly situated,

     Plaintiffs,

v.             CIVIL  ACTION  NO.  3:09-0758

THE WEST VIRGINIA REGIONAL JAIL AND
CORRECTIONAL FACILITY AUTHORITY;
TERRY L. MILLER, both individually and in his
official capacity as Executive Director of the
West Virginia Regional Jail and Correctional
Facility Authority; JOSEPH A. DELONG, both
individually and in his capacity as Acting Executive
Director of the West Virginia Regional Jail
and Correctional Facility Authority; and LARRY
PARSONS, both individually and in his
official capacity as Executive Director of the
West Virginia Regional Jail and Correctional
Facility Authority,

     Defendants.

**MEMORANDUM OPINION AND ORDER**

    Pending before the Court are the parties' cross-motions for summary judgment. ECF

Nos. 149 & 157.  The Court held a hearing on the motions on September 19, 2013.  Based upon the

arguments of the parties and evidence submitted, the Court **GRANTS** the motion by Defendants The

West Virginia Regional Jail and Correctional Authority (WVRJA), Terry L. Miller, Joseph A.

DeLong, and Larry Parsons[1] and **DENIES** the like motion by Plaintiffs Michael Cantley and Floyd Teter.

**I.**
**FACTUAL AND**
**PROCEDURAL HISTORY**

The procedural history of this case was set forth recently in this Court's Memorandum Opinion and Order entered on May 30, 2013 (ECF No. 107), denying Defendants' Renewed Motion to Dismiss Plaintiffs' Third Amended Complaint. To briefly reiterate, this action was filed on July 1, 2009, by Plaintiff Michael Cantley, individually and on behalf of a class of others similarly situated, against the WVRJA and Mr. Miller. In his First Amended Class Action Complaint filed on October 9, 2009, Plaintiff Cantley claimed he was arrested on or about September 28, 2008, on non-felony charges and was required to undergo a visual cavity strip search[2] and delousing pursuant to a WVRJA policy. Plaintiff Cantley claimed that the WVRJA policy of strip searching and delousing pretrial detainees charged with misdemeanors or other minor crimes is unconstitutional under the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983.

---

[1]Mr. Miller was the Executive Director of the WVRJA at the time Plaintiffs Cantley and Teter were detained. Mr. DeLong served as the Executive Director after Mr. Miller until Mr. Parsons was named as the Executive Director. Later, Mr. DeLong was renamed as the Executive Director and is currently serving in that position.

[2]"A 'strip search,' though an umbrella term, generally refers to an inspection of a naked individual, without any scrutiny of the subject's body cavities. A 'visual body cavity search' extends to visual inspection of the anal and genital areas. A 'manual body cavity search' includes some degree of touching or probing of body cavities." *Blackburn v. Snow*, 771 F.2d 556, 561 n.3 (1st Cir. 1985) (citation omitted).

Defendants WVRJA and Mr. Miller filed a motion to dismiss.  On August 5, 2010, the Court denied the motion. *Cantley v. W. Va. Reg'l Jail & Corr. Fac. Auth.*, 728 F. Supp. 2d 803 (S.D. W. Va. 2010).  Discovery proceeded in this case until June 1, 2011, when the Court signed the parties' proposed stipulation to stay further proceedings in this matter until after the United States Supreme Court issued a decision in *Florence v. Board of Chosen Freeholders*, another strip search case in a jail setting.  The Supreme Court issued its decision on April 2, 2012. *Florence v. Bd. of Chosen Freeholders*, 132 S. Ct. 1510 (2012).  In the interim period, the Court permitted Floyd Teter to be added as a class representative in a Second Amended Complaint. ECF Nos. 65 & 66.  Mr. Teter  also alleges that he was arrested on non-felony charges, subjected to a visual cavity search, and sprayed with a delousing solution prior to being arraigned.

In light of the Supreme Court's decision in *Florence*, the Court permitted Plaintiffs to amend and file a Third Amended Complaint, in which Defendants DeLong and Parsons were added. ECF No. 89.  The Court also entered a new Scheduling Order.  Thereafter, Defendants filed another motion to dismiss the Third Amended Complaint.  The Court denied the motion on May 30, 2013, and the parties proceeded with discovery.  The parties now have filed cross-motions for summary judgment.  Although this case was filed as a putative class action, a class has not been certified and the only claims before the Court are the individual claims of Plaintiff Cantley and Plaintiff Teter.  Therefore, the Court restricts its decision in this matter to the individual claims of Plaintiffs Cantley and Teter. *See Wooden v. Bd. of Regents of the Univ. Sys. of Ga.,* 247 F.3d 1262, 1289 (11th Cir. 2001) ("[T]he district court is not required to resolve . . . [Plaintiff's] class certification request before resolving a challenge to . . . [Plaintiff's] individual claim.  If the district court were to resolve a summary judgment in Defendants' favor and in so doing dismiss . . .

3

[Plaintiff's] individual claim before ruling on class certification, then . . . [Plaintiff] would not be an appropriate class representative.")

## II.
## STANDARD OF REVIEW

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256.  Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

## III.
## DISCUSSION

### A.
### The *Florence* Decision

Before discussing the specific facts of this case, it is important for the Court to analyze the Supreme Court's recent decision in *Florence*.  As this Court explained in its May 30, 2013 Memorandum Opinion and Order, the Supreme Court in *Florence* was asked to determine whether all detainees who are admitted to the general jail[3] population may be compelled to undress and submit to a close visual inspection. 132 S. Ct. at 1513.   In that case, Albert W. Florence was arrested on an outstanding warrant, which inexplicitly remained in a computer database despite the fact the underlying reason for the warrant was resolved. *Id*. at 1514.   Upon his arrest, Mr. Florence was confined at the Burlington County Detention Center in New Jersey for six days and then was transferred to the Essex County Correctional Facility. *Id*.

Pursuant to the procedures at the Burlington County jail, every arrestee was required "to shower with a delousing agent." *Id*.  As an arrestee disrobed, officers examined the individual "for scars, marks, gang tattoos, and contraband." *Id*.  Mr. Florence also said he was directed "to open his mouth, lift his tongue, hold out his arms, turn around, and lift his genitals[,]" although it was not clear whether these requirements were normal practice. *Id*. (citations omitted).  During his detention, Mr. Florence "shared a cell with at least one other person and interacted with other inmates[.]" *Id*. at 1513.

---

[3]The Supreme Court used a broad meaning of the word "jail" to include prisons and detention facilities. 132 S. Ct. at 1513.

5

Similarly, when Mr. Florence was transferred to the Essex County Correctional Facility, he was placed in a holding cell, instructed to disrobe, and subjected to a visual inspection "for body markings, wounds, and contraband" while "an officer looked at . . . [his] ears, nose, mouth, hair, scalp, fingers, hands, arms, armpits, and other body openings" without touching him. *Id.* at 1514 (citation omitted). "This policy applied regardless of the circumstances of the arrest, the suspected offense, or the detainee's behavior, demeanor, or criminal history." *Id.* Mr. Florence then was required to shower (while his clothes were inspected) and, thereafter, was admitted to the Essex facility. Mr. Florence was released the following day, after the charges were dismissed. *Id.*

Mr. Florence brought an action challenging the policy requiring visual cavity strip searches of those arrested for minor offenses, without any reason to believe the arrestee was harboring weapons, drugs, or contraband. *Id.* at 1514-15. The district court certified a class and, after discovery, ruled on summary judgment that the policy violated the Fourth Amendment. *Id.* at 1515. The United States Court of Appeals for the Third Circuit reversed, finding the procedure "struck a reasonable balance between inmate privacy and the security needs of the two jails." *Id.* (citation omitted). The Third Circuit premised its holding on finding that the searches occurred prior to an arrestee's admission into the general population. Mr. Florence did not dispute this premise. *Id.*

In ruling on the constitutionality of the policy, the Supreme Court acknowledged the difficulties in operating and maintaining safety in detention facilities, which "requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face." *Id.* The Supreme Court emphasized its position of giving deference to correctional authorities and upholding regulations that impinge upon the constitutional rights of

inmates if they are "'reasonably related to legitimate penological interests.'" *Id.* (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987) (other citations omitted)).  In addition, the Supreme Court  recognized there is no mechanical test to determine the reasonableness of an intrusion into an inmate's privacy. *Id.* at 1516 (citing *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)).  Rather, "[t]he need for a particular search must be balanced against the resulting invasion of personal rights." *Id.* (citing *Bell*, 441 U.S. at 559).

Utilizing this balancing test, the Supreme Court upheld "[p]olicies designed to keep contraband out of jails and prisons." *Id.* (citing *Block v. Rutherford*, 468 U.S. 576 (1984) (banning contact visits); *Hudson v. Palmer*, 468 U.S. 517 (1984) (upholding random searches of inmates' lockers and cells)).  The Supreme Court recognized that its prior "cases establish that correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." *Id.* at 1517 (citation omitted).  In addition, the reasonableness of a policy, when juxtaposed to legitimate security concerns, lies within the realm and expertise of those officials.  Further, the Supreme Court repeatedly admonished that "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations courts should ordinarily defer to their expert judgment in such matters." *Id.* (citations omitted).

Applying this standard, the Supreme Court stated that admitting a new detainee to the inmate population creates numerous risks to staff, other inmates, and the new detainee. *Id.* at 1518.  Given that facilities "are often crowded, unsanitary, and dangerous places," there is a significant interest on the part of correctional officials to conduct a thorough search during the intake process.

*Id.* at 1520. Specifically, the Court stated that "[t]he danger of introducing lice or contagious infections, for example, is well documented." *Id*. at 1518 (citations omitted). Likewise, the Court noted that visually inspecting tattoos to identify gang affiliation is a reasonable requirement during the intake process to protect everyone at the facility. *Id.* at 1519. Moreover, screening for contraband during intake is a most serious duty, and some inmates who may be believed to be the lowest risk are actually dangerous criminals and may be caught bringing contraband into jail. *Id*. at 1519-20. The Court noted that, not only do those arrested for minor offenses have the same incentive to conceal contraband, they may be coerced to hide contraband if it is known they are not subject to the same searches as others. Therefore, to carve out an exception to a standard search protocol for those arrested for minor offenses opens the door for those arrestees to being asked or coerced into bringing contraband into the facilities because it will be well known that they will not be searched. *Id*. at 1520-21.

In addition, the Court recognized that, practically speaking, it may be difficult to make inmate classifications based upon current and prior offenses before an intake search is conducted. *Id*. at 1521. Moreover, in the case before it, criminal history records were not available to the intake officers conducting searches and, even if they were available, they may be inaccurate or incomplete. *Id*. (citations omitted). Without reliable information about the arrestees' records, the Court found "it would be illogical to require officers to assume the arrestees in front of them do not pose a risk of smuggling something into the facility." *Id*. Furthermore, even if reliable records are available, requiring officers to make quick decisions on whether the arrestee's record requires a search raises serious difficulties with implementation and opens the door to potential charges of discrimination. *Id*. at 1521-22 (citation omitted). Therefore, for all of these reasons, the Supreme Court affirmed the

8

Third Circuit's decision finding the procedure was a reasonable balance between the need for security and inmate privacy. *Id.* at 1523. In doing so, the Court specifically stated it was not ruling on a situation in which the arrestee's detention had "not yet been reviewed by a magistrate or other judicial officer, and who can be held in available facilities removed from the general population[.]" *Id.* at 1523. In addition, in their concurring opinions, both Chief Justice Roberts and Justice Alito emphasized that the Court was not foreclosing the possibility of an exception when a detainee has been arrested for a minor offense, the detention has not yet been reviewed by a judicial officer, and the detainee may be placed in an alternative facility away from the general inmate population. *Id.* at 1523-24.

## B.
## Search of Mr. Cantley

Applying *Florence* to the present case, the Court considers separately the facts related to the named Plaintiffs' strip search claims. With respect to Mr. Cantley, it is undisputed that he was arrested on non-felony charges of violating a domestic protection order on September 28, 2008. Following his arrest, Mr. Cantley was taken before a magistrate for his arraignment. Afterwards, he was admitted to the Western Regional Jail pursuant to a Jail Commitment Order signed by the magistrate judge.[4]

---

[4]Plaintiff Cantley also makes a general statement in his Third Amended Complaint that he "was admitted to the Western Regional Jail on other occasions during the class period, and was strip searched and deloused prior to being arraigned before a judicial officer." *Third Amend. Compl.* ¶ 50. He further states that on some occasions he was admitted for misdemeanor or other minor crimes and there was no reasonable suspicion to search him. *Id.* ¶ 51. Although Plaintiff Cantley makes these general statements, it is clear the focus of his claim, and the focus of discovery, always has been his detention on September 28. Other than some records showing he was admitted to the facility on multiple occasions, Plaintiff Cantley makes these self-serving allegations with no real supporting evidence. Therefore, to the extent Mr. Cantley is now attempting to argue there were other occasions in which he was improperly strip searched and deloused, the Court rejects those arguments as being

(continued...)

Lieutenant C.E. Aldridge, who is assigned to the Western Regional Jail and named as one of Defendants' Rule 30(b)(6) designees, stated in his deposition that, if a detainee had a commitment order from a magistrate judge (as was the case with Mr. Cantley), the detainee, upon entry to the facility, was given a pat down search.[5]  The detainee also was asked if he or she needed any medical attention and was given a quick medical assessment.  If deemed fit for incarceration, the arresting officer was permitted to leave, and jail officials began the booking process.  The detainee had his or her fingerprints and photographs taken, and the detainee's information was entered in the jail's computer system (referred to as the TAG system).  The detainee was then taken to a shower area and visually strip searched and deloused.  During this process, the detainee was given a prison uniform, and the detainee's clothes were checked for contraband and placed in a property bag.

Lt. Aldridge further stated in his deposition that he was aware of incidents where weapons were found in duffle bags and in ankle holsters and instances in which pills were found.  He also recounted a recent incident in which a temporary female detainee, who had not been arraigned, had a cigarette fall out of her bra.  As a result, she was strip searched and a lighter and dice were found on her person and cash was found in her vagina.[6]

---

[4](...continued)
insufficiently pled as a matter of law.

[5]Lt. Aldridge stated jail officials also take the detainee's personal property and shoes, but the detainee is kept in his or her clothes during this time.

[6]Although the woman was a pre-arraignment detainee, Lt. Aldridge stated she was searched because the cigarette fell out of her bra, which gave the booking officer reasonable suspicion to search her.

Upon his arrival at the Western Regional Jail, Mr. Cantley stated in his deposition that he was patted down and booked into the facility.  According to an Incident Report filed by booking officer Corporal Ferrell, Mr. Cantley cursed at the deputy upon entry to the facility.  Cpl. Ferrell initially was able to calm Mr. Cantley down, but he then began cursing and making threatening statements.  Mr. Cantley was cleared by a nurse and placed in a holding cell.  However, Mr. Cantley began kicking the cell door.  Despite being told to stop, Mr. Cantley refused to do so and, ultimately, he was placed in a restraint chair.  When a nurse attempted to check Mr. Cantley, he tried to grab her hand.  According to Cpl. Ferrell, Mr. Cantley yelled, cursed, and struggled to get out of the chair for an hour and a half.  The Inmate Special Watch Log indicates that, during that time, he also threatened to strangle an officer.  He was removed from the chair fifteen minutes after he calmed down.  In his deposition, Mr. Cantley said that, except for a few minor differences, the Incident Report was accurate.[7]

Mr. Cantley testified that, prior to being admitted to the general housing population, he was strip searched and deloused.  The strip search entailed him removing his clothing in a private shower area where he could not be seen by other detainees.  After disrobing, he handed his clothes to a male correctional officer who checked his clothes for contraband.  Mr. Cantley stated there was only one correctional officer in the room with him.  Mr. Cantley was then subjected to a visual inspection by the same officer, which included Mr. Cantley raising his scrotum, bending over, and coughing.  There are no allegations that the officer ever touched Mr. Cantley during the process.  After the visual inspection, Mr. Cantley stated he was asked to walk over to the shower area, where

---

[7]In his deposition, Mr. Cantley did say the Incident Report inaccurately stated the time he was released from the restraint chair and inaccurately stated he broke free from one of the restraints.

the officer sprayed him with a delousing solution from a Windex type bottle. He then was permitted to shower off and dress in his prison uniform. After dressing, Mr. Cantley was placed in a holding cell with other people until he was assigned to the general housing unit. Mr. Cantley remained incarcerated in the general inmate population until he was released on November 6, 2008.

Upon consideration of this evidence, the Court finds as a matter of law that the visual cavity strip search conducted on Mr. Cantley did not violate his constitutional rights. As recognized in *Florence*, Defendants have a significant interest in searching detainees to ensure they are not bringing any contraband into a facility, even when detainees like Mr. Cantley are held for minor offenses. The search here was conducted post-arraignment by a male correctional officer who never physically touched Mr. Cantley. The area in which Mr. Cantley disrobed was a private setting where no other correctional officers or other detainees could see him. After the search was complete, Mr. Cantley was placed in a general housing unit, where he remained for over a month.[8] Clearly, Mr. Cantley's search falls precisely within the parameters of the constitutionally-permitted conduct outlined in *Florence*.[9] Therefore, the Court **GRANTS** Defendants' Motion for Summary Judgment with respect to this claim.

---

[8] Mr. Cantley stated during his deposition that, after the search, he was placed back in a holding cell with other inmates/detainees before he got his assignment to a pod in general housing.

[9] Moreover, although not necessary to establish the constitutionality of Mr. Cantley's search, the Court finds the search was permissible on other grounds. Mr. Cantley was arrested for violating a domestic violence protection order and was acting in a violent manner when he was admitted to the facility. Not only did he attempt to grab a nurse, he threatened to strangle a correctional officer and was so belligerent that he was placed in a restraint chair for an hour and a half before he calmed down. Certainly, under these circumstances, officers were justified in searching Mr. Cantley to ensure their personal safety and the safety of others in the facility.

12

**C.**
**Search of Mr. Teter**

Turning next to Mr. Teter's claim, he was arrested on Friday, February 19, 2010, on misdemeanor charges of Putting Debris in a Roadway and Obstructing an Officer.  At his deposition, Mr. Teter said he believed he was arrested between 3:00 and 4:00 in the afternoon.  Following his arrest, Mr. Teter was taken to a local hospital to be examined and then was transported to the Preston County Courthouse, where he was fingerprinted but did not appear before a judicial officer.  When he was finished at the Courthouse, he was taken to the Tygart Valley Regional Jail in a cruiser with an inmate whom he believed was being transferred from a federal facility.  When he got to the regional jail, he and the inmate being transferred were patted down by correctional officers and brought to the intake area.  The booking data sheet shows he arrived at the facility at 10:15 p.m. on Friday.

During the intake procedures, officers took his personal property, and he discussed his medical situation with a nurse.  According to the booking data sheet, he was medically pre-screened at 10:25 p.m. and screened again at 2:45 a.m. on Saturday.  Afterwards, Mr. Teter said he was taken to a shower room and asked to undress.  Mr. Teter testified that there was one male correctional officer in the room with him, whom he identified as Sergeant Daniel Cutright.  According to Mr. Teter, Sgt. Cutright searched his clothes and placed them in a bag.  Sgt. Cutright then asked him to spread his legs, lift his testicles, turn around, bend over, and spread his cheeks.  He also checked in Mr. Teter's mouth.  When he finished with the visual inspection, Sgt. Cutright took a garden type

13

sprayer and sprayed a delousing solution on him.[10]  Mr. Teter was instructed to wait for some period

of time, a matter of minutes, before he could shower.[11]  After his shower, Mr. Teter dressed in a jail

uniform and ultimately was taken to a holding cell.  Mr. Teter said that another person was put in the

cell with him.

Mr. Teter testified he was in the cell for three or four hours before he and the other

detainee were placed together in a smaller cell.  He understood that he was being moved into a smaller

cell because the facility was expecting a van load of detainees who were going to be placed in the

larger cell.  Mr. Teter remained in the smaller cell for about one-half hour.  He said he then was taken

through a set of doors and down a hallway past other inmates.   He was placed in a room where he had

a video arraignment and was released on a $500 bond.  According to the Jail Release Order, Mr. Teter

was released at 9:00 a.m. on Saturday.

Sgt. Cutright was deposed, and he described that to get to the video conferencing

room, detainees have to exit the booking area and go into the core part of the facility, which is about

100 to 150 yards from the holding cells.  Sgt. Cutright also said the jail had some inmates who had

been sentenced and whose housing assignments were in the booking area, but the pre-arraignment

detainees were held in different cells.  Sgt. Cutright said that most detainees who arrived at the facility

after 4:00 p.m. were not arraigned until 8:00 a.m. the next day.  When that occurred, detainees, like

---

[10]At oral argument, Defendants clarified that the sprayer was a small, hand-held container, not
attached to any hose, with a low-pressure spray.

[11]At first Mr. Teter said it was a couple of minutes, but later he said it could have been five
to ten minutes.

Mr. Teter, were designated in the TAG system as temporary commitments.[12]  Sgt. Cutright said that, at the time Mr. Teter was brought to the facility, every detainee, whether or not yet arraigned, were subject to being visually strip searched and deloused.

Sgt. Cutright claimed that he was aware of multiple pieces of contraband being discovered during pat down searches of individuals arriving at the Tygart Valley facility, including knives, ammunition, brass knuckles, large pieces of metal, illegal drugs, cigarettes, and lighters.  He further testified he had found just as much contraband in detainees' genital areas while doing strip searches as he had by doing pat down searches.  He also said he had found such items taped in armpits during strip searches.  In his Affidavit, Sgt. Cutright averred that the cells where new detainees are held at Tygart Valley hold up to 15 detainees at a time.  He said it was impossible to predict how many people will be placed in a cell on any given occasion because it is dependent upon how many individuals are arrested and brought to the facility.

Defendants' Rule 30(b)(6) designee for the Tygart Valley facility is Sergeant Michael Wayne.  Sgt. Wayne was deposed and confirmed Sgt. Cutright's statement that the video arraignment room is located in the core area of the facility.  He also agreed with Sgt. Cutright that everyone who was brought to the facility was visually strip searched and deloused.  In January 2011, however, the Tygart Valley facility was directed to change its practice so that no one charged with a minor crime could be strip searched and deloused until after arraignment unless correctional officers had

---

[12]The designation also is referred to as a CDR because it is made on a document entitled Core Disposition Reporting.  Sgt. Cutright noted there are a number of situations where detainees are not considered temporary commitments, but those other situations are not applicable to Mr. Teter's case.

reasonable suspicion to search.  Sgt. Wayne stated that the facility was told to change its procedure to be in compliance with Policy and Procedure Statement 17001.

Sgt. Wayne said he was troubled by the directive because he believed it downgraded security at the facility.  He stated that, as a result of inmate overpopulation, they only can use holding cells five and six in the booking area to hold detainees.[13]  As a result, detainees are segregated only by sex, not by whether they are charged with a felony or misdemeanor.  Although the detainees were subjected to pat down searches upon arrival at the facility, he recalled an incident after the directive was issued when marijuana was found inside a holding cell and the detainees were smoking it.  He also recalled a time when a woman concealed eighty Xanax pills on her person and the entire group of detainees in the cell were high on Xanax.  He further said that when he has conducted strip searches he has found contraband, including cocaine in the underwear of a person charged with a misdemeanor offense of domestic violence.

Policy and Procedure Statement 17001, referred to by Sgt. Wayne, sets forth the official Inmate Admission Procedures promulgated by the WVRJA.  Procedure J of 17001 provides that "[e]ach inmate committed to a regional jail facility will be required to delouse and shower prior to being placed in a housing unit."  *Policy and Procedure Statement*, at 8.  In addition, Policy and Procedure 17004, referred to by both parties, states, in part:

---

[13]At the hearing, counsel represented there are six cells in the booking area.  Cells one through four are small cells designed to hold just one or two people.  Cells five and six are large cells.  The small cells often are used to hold those who are ill, mentally unstable, or under the influence of drugs and alcohol.

16

> A newly admitted inmate charged with a misdemeanor will be strip searched only upon reasonable suspicion that the inmate is concealing weapons, contraband or evidence. Reasonable suspicion must be documented by the Shift Supervisor. In determining whether reasonable suspicion exists, circumstances surrounding the arrest, the crime for which the person is charged, and the inmate's conduct at time of admission shall be considered. In any case, no inmate shall be placed in a housing unit until showered and personal property inventoried in accordance with Policy 17001.

*Policy and Procedure Statement*, at 1-2. These policies have been in effect since May 15, 1997, long before Mr. Teter was taken into custody. Although the parties disagree on the meaning and implementation of these policies, they do agree that Tygart Valley's practice of doing blanket strip searches of all detainees violated the policies to the extent they may prohibit a strip search of a misdemeanant pre-arraignment detainee absent reasonable suspicion to conduct a search. Regardless of whether the strip search of Mr. Teter violated the WVRJA's own policy, however, the first thing the Court must consider is whether, in light of the facts of his case, the strip search violated Mr. Teter's constitutional rights.[14]

Although *Florence* left open the question of whether blanket pre-arraignment strip searches of those charged with minor offenses violate detainees' constitutional rights, the Court finds the decision instructive in Mr. Teter's case. *Florence* specifically directs courts to begin their analysis with the framework announced in *Bell v. Wolfish*, 441 U.S. 520 (1979). *Florence*, 132 S. Ct. at 1516. In *Bell*, the Supreme Court recognized the need for a search must be balanced against an individual

---

[14]Moreover, even when a state policy is not followed, it does not necessarily mean there is a constitutional violation. *See Smith v. Atkins*, 777 F. Supp. 2d 955, 965 (E.D. N.C. 2011) (stating "the mere failure to comply with . . . [a] state regulation and jail policy [regarding suicide watches] is not a constitutional violation").

detainee's rights. *Bell*, 441 U.S. at 559. In applying this balancing test, the Supreme Court upheld the constitutionality of requiring pretrial detainees "to expose their body cavities for visual inspection as part of a strip search conducted after every contact visit with a person from outside the institution." *Id*. at 558 (footnote omitted). The Court made clear that the "[l]oss of freedom of choice and privacy are inherent incidents of confinement in such a facility" and correctional officials must have the power to discover and deter in a reasonable manner the smuggling of contraband into facilities. *Id*. at 537 & 560; *see also Florence*, 132 S. Ct. at 1517 (reiterating that case law "establish[es] that correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities"). Moreover, the Supreme Court emphasized in *Florence* that, "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations courts should ordinarily defer to the expert judgment in such matters." *Florence*, 132 S. Ct. at 1517 (internal quotation marks and citations omitted).

In this case, the Tygart Valley facility admittedly was conducting blanket visual strip searches of all detainees, which included Mr. Teter, apparently contrary to Defendants' policies. The Court finds the search of Mr. Teter, nevertheless, did not violate his constitutional rights. The deposition testimony of both Sgt. Cutright and Sgt. Wayne establishes that the facility had a reasonable concern about detainees bringing dangerous contraband into the facility. Although detainees were patted down when they arrived at the facility, Sgt. Cutright stated he found just as much contraband during strip searches as during pat down searches. Similarly, Sgt. Wayne specifically recalled an incident, after they stopped doing blanket searches, when detainees were found smoking marijuana in a holding cell and when an individual secreted Xanax pills on her person and apparently shared them with the other detainees. He also recalled a time when he discovered

18

cocaine during a strip search of an individual charged with a misdemeanor offense of domestic violence.

The problem with exempting misdemeanant pre-arraignment detainees from strip searches at the Tygart Valley facility is compounded by the fact that detainees are segregated by sex and held together in a communal cell that holds up to fifteen people.  The Tygart Valley facility serves as the detention center for at least six counties in West Virginia, and it is impossible for correctional officers to know in advance how many detainees they will hold at any given time or whether those detainees will be charged with misdemeanors or felonies.  When detainees, like Mr. Teter, are brought to the facility after the magistrates or judges go off duty, they have to wait until the next morning in the holding cell until their arraignment.  The result is that detainees who are charged with misdemeanors and those charged with felonies end up in the same holding cell.   In addition, for various reasons, committed inmates are sometimes assigned to the other cells in the booking area as their general housing assignment.

As recognized by the Supreme Court in *Florence*, "[e]xempting people arrested for minor offenses from a standard search protocol," when misdemeanants and felons are intermingled, increases the risk of "more contraband being brought into the detention facility" and it "is a substantial reason not to mandate the exception . . . as a matter of constitutional law." *Id*. at 1521.  At the Tygart Valley facility, there is not only the intermingling of misdemeanant and felony detainees, but other committed inmates are sometimes assigned to the booking area.  Detainees also may encounter committed inmates when they go to the video conferencing room because it is located in the core of the facility.  In fact, Mr. Teter stated that he saw other inmates when he went to the video

19

conferencing room for his arraignment.  At the hearing, defense counsel further explained  that the video conferencing room is used by all inmates, both pretrial detainees and committed inmates.

Although the Court views the intrusion on Mr. Teter's privacy as significant, it is tempered somewhat by the fact it was conducted in a private setting, with a same-sex correctional officer who never physically touched him.  No doubt it was an embarrassing and humiliating experience for Mr. Teter, but his interest must be weighed against the strong interest correctional officials have in preventing the introduction of contraband at the facility.  In balancing these interests, the Court finds it weighs in favor of the officials at the Tygart Valley facility, where, as described above, there was a problem with contraband, detainees were held communally in an area that sometimes held other committed inmates, and detainees had to walk into the core of the facility to be arraigned where other committed inmates were present.  Clearly, there is a risk that contraband could be introduced at the Tygart Valley facility because of the manner in which pre-arraignment detainees are held.  The Court certainly cannot say there is substantial evidence demonstrating that blanket visual strip searches at the Tygart Valley facility are an exaggerated response to the situation.[15]

In addition, merely because a detainee is currently being held on a misdemeanor does not mean the detainee is not dangerous or has no significant criminal history for other more serious

---

[15]In 1981, the Fourth Circuit decided *Logan v. Shealy*, 660 F.2d 1007 (4th Cir. 1981), in which it determined that a visual strip search of a detainee being held for driving while intoxicated was unconstitutional.  To the extent *Logan* remains viable under *Florence*, the Court finds that it clearly is distinguishable from the facts presented in this case.  In *Logan*, the detainee was not intermingled with the general inmate population, she was at the facility for only one and one-half hours and her release was impending, and she was not subject to a pat down search before being strip searched. 660 F.2d at 1013.  In addition, the court noted that the search may have been conducted in an area where others could observe her because the window blinds were either open or broken. *Id*. at 1010.

offenses.  Likewise, misdemeanants may have their own incentive to bring contraband to the facility.

Even if they do not have such an incentive, if it is known that misdemeanant pre-arraignment detainees are not strip searched, others may coerce them to hold contraband for them.  *See Florence*, 132 S. Ct. at 1521 (stating "[e]ven if people arrested for a minor offense do not themselves wish to introduce contraband into jail, they may be coerced into doing so by others.  This could happen any time detainees are held in the same area, including in a van on the way to the station or in the holding cell of a jail.").  Accordingly, the Court finds that, under the particular circumstances at the Tygart Valley facility, the correctional officials implementing the search struck a reasonable balance between the need to provide safety and security at the facility and Mr. Teter's privacy interests.  Thus, the Court finds the visual strip search at the Tygart Valley facility did not violate Mr. Teter's constitutional rights and **GRANTS** summary judgment in favor of Defendants on this claim.[16]

### D.
### Delousing Procedure

Plaintiffs also complain that the compulsory delousing procedure at the facilities was unconstitutional because it violated the detainee's right to privacy and it constituted an unwanted medical treatment.  In addition, Plaintiffs claim the process is degrading, ineffective, and unnecessary and there are reasonable alternatives to a universal delousing policy.  In balancing the interests of detainees against the interest of facility officials, however, the Court finds the policy strikes a reasonable balance and does not violate the detainees' constitutional rights.

---

[16]Defendants claim they are entitled to summary judgment on several grounds, including qualified immunity.  However, the Court need not address those other arguments because the Court finds there was no constitutional violation.

In *Florence*, the Supreme Court stated that "[t]he danger of introducing lice or contagious infections . . . is well documented." 132 S. Ct. at 1518 (citations omitted).  During his deposition, Lt. Aldridge estimated that he saw thirty to thirty-five cases of lice at the Western Regional Jail over the past year.  Infection control records for 2010 from the Western Regional Jail show incidents of head lice and scabies nearly every month, but no incidence of pubic lice.  Sgt. Wayne explained when outbreaks of lice do occur at facilities, it creates a number of problems.  First, it requires an extensive process to rid the pests from the facility.  Inmates must be deloused and their cells must be stripped and cleaned.  He stated he was aware of another WVRJA facility which had to continuously use delousing solutions on large sections of inmates.  Second, it creates  potential conflicts because those inmates subjected to the process do not think highly of those inmates identified as being infected.

The process of delousing at the facilities involves spraying all detainees[17] with a delousing solution from a plastic sprayer after they have been visually strip searched.  In Mr. Cantley's case it was sprayed from a Windex type bottle, and in Mr. Teter's case it was a garden sprayer.  After the solution is applied, detainees have to keep it on their bodies for about ten minutes before they are allowed to shower it off.  John L. King II, who is the Chief of Operations for the WVRJA, explained that officers do not hand the spray bottle to detainees to spray on themselves because the bottle may be used as a weapon, they may spray it at the face of the officer, or they may not comply with applying the solution.  In addition, Mr. DeLong, who is the acting Executive Director

---

[17]Mr. King stated pregnant women are not sprayed.

of the WVRJA, stated in his deposition that they do not provide nit combs to detainees because the detainee may use the comb as a weapon.

There is no medical screening to determine whether or not a particular detainee has lice before they are sprayed.  Mr. King explained the WVRJA contracts with a medical company that provides medical care throughout the facilities, and there may be one or two nurses on duty at a jail during normal business hours.  Mr. King stated it is simply not practical to do visual inspections of every detainee given the volume of detainees coming into some of the facilities and the amount of medical care they must provide other inmates.  Given limited resources, Mr. King said it is an administrative decision to use their personnel and resources in the most cost effective manner they can.  Moreover, he stated that most of the nurses are female, so visual inspections would require a female nurse to come into the shower area and closely inspect both male and female detainees' bodies, including their pubic areas, to see if there are any nits or lice present.  Mr. King believed this process would be much more embarrassing to a detainee then just being sprayed with a solution.   Indeed, Plaintiffs' own proffered expert, Richard J. Pollack, Ph.D., a public-health entomologist, stated in his Preliminary Report that the detection of louse eggs and their hatchlings requires specialized training and a close inspection or the use of an illuminated magnification device.  He further opined it may take a skilled inspector an hour to examine long, braided or tangled hair on someone's head.

Toxicologist Anthony F. Pizon, M.D. was named as Defendants' delousing expert. In his deposition, Dr. Pizon stated that it is more likely to see lice in places like prisons because the population is held closely together and it easily spreads.  Dr. Pizon said Liceall, the delousing solution used by the WVRJA, is a pyrehtrin, which is a safe over-the-counter natural product derived from a

23

chrysanthemum plant.  Although Dr. Pizon said he recommends two applications of the solution about seven days apart because of the life cycle of lice and their eggs, he estimated that one application will eradicate lice on about fifty to seventy-five percent of people who have it.  With two treatments, he said it would eliminate lice on about ninety percent of the people who have it.  Dr. Pollack also opined that a single application would not kill embryotic lice.

Dr. Pizon opined that proactively delousing detainees in a correctional facility is appropriate because there is a greater risk of lice in a prison population, delousing treats everyone the same, and Liceall is a safe product.   He also approves of the manner in which the WVRJA has correctional officers apply the solution because they can ensure it is thoroughly applied to the hairy areas of the body and officers can avoid getting the solution on sores or in eyes, which may cause irritation.  He  further mentioned that detainees may attempt to drink the solution if correctional officers hand it to them to apply themselves.

Plaintiffs argue that, because there is only one application and detainees are not provided a nit comb to remove eggs, the treatment is completely ineffective.  Plaintiffs insist that a better procedure would be to ask the detainees whether they have lice or to have them screened by a nurse or assessed by a correctional officer.  In addition, Plaintiffs contend there is no legitimate justification for delousing detainees' entire bodies because none of the deponents could identify a single outbreak of body lice in the regional jail system.  Despite these arguments, the Court finds the policy strikes a reasonable balance between the legitimate interests of the WVRJA and the detainee.

In assessing Plaintiffs' arguments, the Court is guided by *Turner v. Safley*, 482 U.S. 78 (1987). In *Turner*, the Supreme Court recognized that "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." 482 U.S. at 84-85. In addition, the Supreme Court cautioned that "[w]here a state penal system is involved federal courts have . . . additional reason to accord deference to the appropriate prison authorities." *Id*. at 85 (citation omitted). "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id*. at 89. In assessing the reasonableness of a regulation, courts should consider: (1) whether there is a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it[;]" (2) whether there are alternative means of exercising the right that remain open to prison inmates[;]" (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally[;]" and (4) "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Id*. at 89-90 (citations omitted).

In applying these considerations to the present case, the Court finds there is a valid and rational relationship between the delousing policy and the correctional authorities' interest in reducing the outbreak of lice in the jails. As stated above, lice infestation is a real problem in correctional facilities. Inmates live in close quarters and outbreaks can be hard and expensive to eradicate. The delousing policy is designed to reduce the number of outbreaks in the facility by eliminating anywhere from fifty to seventy-five percent of the cases from the outset. Although the process does not kill embryotic lice and some outbreaks still occur in the facility, perfection is not a constitutional

requirement.  It certainly is laudable to eradicate a significant percentage of the lice before they spread, and the policy is logically connected to this objective.  Moreover, although there is no evidence of outbreaks of pubic lice in a facility, it is unknown if there would be outbreaks if the policy was not in place.  Given the strong interest correctional officials have in maintaining a lice-free environment, the Court finds that the policy is not unreasonable.

Next, the Court recognizes that the correctional officials should be given deference as to what is the most effective and efficient manner in which to maintain a lice-free environment. Plaintiffs suggest correctional officers simply should ask an inmate whether they have lice and then delouse as needed.  However, as noted by Mr. King, correctional officers cannot trust that detainees will give an honest answer because it may be a situation in which they do not know they have lice or they may have a reason to lie about it.  In addition, the Court rejects Plaintiffs' suggestion that the delousing policy should be replaced by physically screening all inmates.  Such a process would be extremely time consuming, expensive, and intrusive as it would require either an up-close or illuminated magnification of a detainee's body.  In addition, if the screening is performed by a nurse, it will have a significant impact on the other inmates in need of medical care because those nurses would be unavailable to deliver that care unless correctional officials would allocate more prison resources for additional nurses.  Under these circumstances, the Court will leave to the sound discretion of the WVRJA how best to allocate its resources and reduce the incidence of lice in the jails in a cost effective and efficient way.

In addition, the Court finds the policy is not unconstitutional because the detainees are sprayed by a correctional officer rather than given a cup of the solution to apply it to themselves, as

26

Plaintiffs assert were the underlying facts in *Florence*.  First, the Court recognizes that the detainees already have been visually strip searched so the fact they remain in view of the correctional officer for a very limited time longer in order to be deloused is not a significant additional impingement on their right to privacy.  Second, the correctional officers have offered legitimate reasons for not allowing detainees to apply the solution to themselves because they may not comply, may use it as a weapon, or may apply it improperly or incompletely.  Third, the correctional officers never touch the detainees with their hands; they merely spray the solution on them.  Plaintiffs attempt to compare this spraying with the unconstitutional touching in *Amaechi v. West*, 237 F.3d 356 (4th Cir. 2001), but that case is far removed from the facts of this case. *See Amaechi*, 237 F.3d at 359-60 (finding a constitutional violation where a semi-clad woman, who was being arrested for a noise violation that occurred two days earlier, was subjected to an officer swiping his ungloved hand across the vagina in front of her townhouse where others could observe).  Thus, the Court finds no reason to declare the policy unconstitutional based upon the manner in which it is applied.  Therefore, the Court finds that the delousing policy at issue in this case is reasonably related to the WVRJA's goal of decreasing the spread of lice and it is entitled to deference.  The Court finds neither Mr. Cantley nor Mr. Teter's constitutional rights were violated by virtue of being deloused.

## IV.
## CONCLUSION

Accordingly, after review of the undisputed evidence submitted in this case and for the foregoing reasons, the Court **GRANTS** summary judgment in favor of Defendants on Plaintiffs' claims and **DENIES** summary judgment in favor of Plaintiffs.  In addition, as Defendants have been awarded summary judgment on Plaintiffs' individual claims and a class has not been certified, the Court finds Plaintiffs may not proceed with this action. *See J & R Mktg., SEP v. Gen. Motors Corp.*,

549 F.3d 384, 390 (6th Cir. 2008) ("If it is found, prior to class certification, that the named plaintiffs' individual claims are without merit, then dismissal is proper."); *Bass v. Butler*, 116 F. App'x 376, 385 (3d Cir. 2004) (dismissing class claim where individual claims were dismissed pre-certification). Thus, as there are no other matters pending before the Court, the Court **DISMISSES** this case from the docket of the Court.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:        October 4, 2013

ROBERT C. CHAMBERS, CHIEF JUDGE